No. 93,751

STATE OF KANSAS, *Appellee*, v. IAN WOOLVERTON, *Appellant.*
(159 P.3d 985)

Opinion filed June 8, 2007.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Ian Woolverton petitioned this court to review the Court of Appeals' decision upholding his convictions of criminal threat and telephone harassment in *State v. Woolverton*, 35 Kan. App 2d 478, 131 P.3d 1253 (2006). Woolverton asserts that the district court erroneously admitted evidence regarding his prior conviction for criminal threat against the victim, Cathy Rotski; that the State of Kansas does not have jurisdiction; and that his statements to police should have been suppressed because he was never informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966).

Woolverton's convictions are the result of a domestic dispute that began over parenting time. Woolverton and Cathy Rotski are the parents of a child born in February 2002. A few months later, in June 2002, Woolverton moved into an apartment in Kansas City, Missouri, with his new girlfriend, Melinda Edwards. Rotski, who lived in Prairie Village, Kansas, maintained physical custody of the child and allowed Woolverton to visit with the child from time to time if he arrived promptly for the visit.

On December 24, 2003, Edwards spoke with Rotski on the telephone regarding an opportunity for Woolverton to visit his child during the Christmas holidays. Edwards understood that either Woolverton or Rotski would call on December 26th to make arrangements for the visit. Rotski, on the other hand, understood that Woolverton would be at her house to visit with the child at 10 a.m. on December 26th.

When Woolverton had not arrived at her house by 10:10 or 10:15 a.m. on December 26th, Rotski called Woolverton at Edward's apartment. Rotski's call woke Woolverton and Edwards. Edwards answered the phone and immediately handed it to Woolverton when she heard Rotski angrily ask, "Where's he at?" When Woolverton took the phone, Rotski called Woolverton a motherfucker, then yelled and cussed at him while informing him that his visit was cancelled. Woolverton angrily yelled and cussed at Rotski, calling her a slut and a whore. When Rotski told Woolverton that he

would never see his child again, Woolverton shouted, "I will fucking kill you."

Rotski hung up the phone, and Woolverton immediately called her back. According to Rotski, Woolverton called Rotski approximately eight times within a 30-minute time period. Rotski refused to answer three of the calls, and Woolverton left three messages on Rotski's telephone answering service (Call Notes). Although Woolverton did not threaten Rotski in any of the messages, he continued to call Rotski names and use abusive and profane language.

Rotski immediately called the Prairie Village police and reported the phone calls. A Prairie Village detective responded within a few minutes to Rotski's house and talked to Rotski, who appeared to be a little annoyed and upset but not distraught. The police officer made a recording of the three messages.

On December 30, 2003, two Prairie Village detectives went to Edward's apartment in Kansas City, Missouri, to interview Woolverton. The detectives asked to talk with Woolverton, who suggested that they talk in the stairwell of the apartment building. The detectives told Woolverton that he would not be arrested and could return to his apartment after the interview. Although Woolverton initially denied threatening Rotski, he later admitted that he had threatened to kill her. Woolverton also admitted making three other calls to Rotski and leaving messages on her Call Notes.

During Woolverton's interview with the detectives, Edwards peeked her head into the stairwell to check on Woolverton. Woolverton advised her that everything was fine and he would return to the apartment soon.

The State charged Woolverton with one count of criminal threat and one count of telephone harassment. Woolverton filed a motion to suppress his confession, arguing that he had not been given *Miranda* warnings. Following a hearing, the district court denied Woolverton's motion.

Woolverton also filed a motion in limine, seeking to prevent the State from introducing evidence of Woolverton's prior conviction for criminal threat against Rotski. At a hearing on Woolverton's

motion, the State agreed not to introduce Woolverton's prior conviction because it was not relevant.

At trial, the State presented evidence from the Prairie Village police detectives and Rotski. Woolverton attempted to admit evidence to establish his discordant relationship with Rotski regarding their child, but the district court limited the evidence to the most recent disputes between Woolverton and Rotski. Edwards testified on behalf of Woolverton and admitted overhearing Woolverton angrily threaten to kill Rotski.

Woolverton also testified, admitting that he threatened to kill Rotski and stating that he was upset because Rotski said she would run from state to state to prevent him from seeing his child. During the State's cross-examination of Woolverton, the prosecutor asked Woolverton if he had ever threatened Rotski before. When Woolverton responded that he had never threatened Rotski before, the district court, over Woolverton's objection, allowed the State to inquire about Woolverton's prior conviction for criminal threat against Rotski to impeach Woolverton's credibility.

A jury found Woolverton guilty of criminal threat and telephone harassment. The district court sentenced Woolverton to 12 months probation and required Woolverton to serve 30 days in jail on the criminal threat charge. For the telephone harassment charge, the district court ordered Woolverton to serve 12 months probation concurrent with his sentence for criminal threat.

Woolverton appealed his convictions, and the Court of Appeals affirmed them in *Woolverton*, 35 Kan. App. 2d 478. The matter is now before us on Woolverton's petition for review.

*Admission of Woolverton's prior conviction*

Woolverton claims that the district court improperly admitted evidence of his prior conviction for criminal threat. Woolverton asserts that the evidence was admitted in violation of K.S.A. 60-455. Woolverton's claim is linked to the following testimony during Woolverton's direct examination:

"Q. When you finished the three phone calls to Miss Rotski, how did you feel?
"A. Like crap because the fact that I just stooped to her level because I'm used to her yelling at me and I don't yell back. My theory is I kill her with

kindness because she's always screaming in the telephone at me. And so I had lost my cool and I stooped to her level."

Based on this response, the following colloquy occurred between Woolverton and the prosecutor during Woolverton's cross-examination:

"Q.  Let's move on. You testified on direct that you never stooped to her level; is that right.
"A.  I did my very best not to.
"Q.  That's not what you said. You said you would never stoop to her level?
"A.  If you were listening right beforehand, I admitted I did stoop to her level.
"Q.  Right. On December 26?
"A.  Yes, I did.
"Q.  How about before that?
"A.  Never.
"Q.  Never?
"A.  Never.
"Q.  Never threatened her?
"A.  Never."

After Woolverton's response, the prosecutor requested that the jury be excused, so he could address the court. The court permitted a bench conference, and the prosecutor requested permission to admit Woolverton's prior conviction for criminal threat against Rotski, arguing that it was "absolutely completely within the purview of me bringing up that conviction." Woolverton's counsel objected, stating that the evidence was irrelevant. Nevertheless, the district court judge granted the State's oral motion without further argument, simply stating, "I'm going to allow it."

Following the bench conference, the prosecutor asked Woolverton if he had previously been convicted of criminal threat against Rotski based on a guilty plea. Woolverton's counsel again objected, and the objection was overruled. Woolverton then admitted that he had previously pled guilty to one count of criminal threat against Rotski.

The first step in considering a challenge to the admission of evidence is to determine whether the evidence is relevant. *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). Relevance is established by some material or logical

connection between the asserted fact and the inference or result it is intended to establish. *Gunby*, 282 Kan. at 47.

The second step in considering a challenge to the admission of evidence is the application of the evidentiary rules. An appellate court reviews the application of the evidentiary rules either as a question of law or an abuse of discretion depending on the contours of the rule in question. 282 Kan. at 47. When the issue involves the adequacy of the legal basis for the district court's decision, the issue is reviewed using a de novo standard. 282 Kan. at 47-48.

Although the State had previously agreed not to introduce Woolverton's prior conviction because it was not relevant to its case in chief, the State sought to admit it on cross-examination to impeach Woolverton's credibility. Evidence to impeach a witness' credibility is relevant. However, the admission of another crime to impeach a witness' credibility is governed by K.S.A. 60-421, which provides:

"Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility. If the witness be the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility."

K.S.A. 60-421 prevents the State from using a defendant's prior convictions for impeachment unless the defendant opens the door by introducing evidence that he or she is credible. A criminal defendant does not place his or her credibility in issue merely by taking the witness stand. *State v. Macomber*, 241 Kan. 154, 157-58, 734 P.2d 1148 (1987) (reversing defendant's conviction because the State improperly questioned the defendant regarding prior crimes during cross-examination); *State v. Quick*, 229 Kan. 117, 121, 621 P.2d 997 (1981) (same); *State v. Harris*, 215 Kan. 961, 963, 529 P.2d 101 (1974) (same); *State v. Harris*, 215 Kan. 649, 651-52, 527 P.2d 949 (1974) (same).

Woolverton claims that he did not introduce any evidence regarding his credibility and, thus, did not open the door for the State. Rather, according to Woolverton, the State opened the door to his credibility for the purpose of admitting his prior conviction

independent of K.S.A. 60-455. The record supports Woolverton's claim that he did not introduce any evidence to support his credibility. Although Woolverton acknowledged on direct examination losing his cool when he yelled back at Rotski, he did not testify that his story was more credible than Rotski's, and he never denied on direct examination that he had threatened her in the past. Because K.S.A. 60-421 requires the accused to admit evidence supporting his or her credibility as a condition precedent to the admission of other crimes for impeachment and that condition was not met in this case, the district court erroneously admitted Woolverton's prior conviction to impeach his credibility.

On appeal, the State raises a new theory for admitting Woolverton's prior conviction, arguing that the evidence was properly admitted to show a discordant relationship between Woolverton and Rotski. According to the State, evidence of a discordant relationship is independently admissible without regard to K.S.A. 60-455. The Court of Appeals agreed with the State's argument, concluding that Woolverton's prior conviction was admissible independent of K.S.A. 60-455. *Woolverton*, 35 Kan. App. 2d at 480. However, after the Court of Appeals' decision in this case was released, we issued our decision in *Gunby*, which eliminated other means for admitting evidence of other crimes or civil wrongs independent of K.S.A. 60-455. 282 Kan. at 57. As a result, we reject the portion of the Court of Appeals' analysis that would have admitted the prior convictions.

The erroneous admission of evidence is subject to the harmless error rule, which is set forth in K.S.A. 60-261:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Woolverton claims that he was prejudiced by the erroneous admission of the evidence. We will analyze each crime separately to determine whether the admission of Woolverton's prior conviction prejudiced his substantial rights. In the first count, the State

charged Woolverton with criminal threat, which is defined as "any threat to: (1) Commit violence communicated with intent to terrorize another . . . or in reckless disregard of the risk of causing such terror." K.S.A. 2006 Supp. 21-3419(a)(1).

Woolverton's prior conviction for criminal threat against Rotski supports the conclusion that Woolverton intended to terrorize Rotski. Woolverton's intent was the main issue for the jury to decide because Woolverton admitted on direct examination that he told Rotski he would "fucking kill her." If the charge for criminal threat had been based solely upon proving that Woolverton intended to terrorize Rotski, the evidence of his prior conviction would have been inconsistent with substantial justice because it was the key piece of evidence to establish Woolverton's intent. However, the State did not limit the charge to proving Woolverton's intent to terrorize. Rather, the State also alleged that Woolverton had a reckless disregard of the risk of causing terror. Because there was other evidence to establish that Woolverton recklessly disregarded the impact of his statements, the admission of his prior conviction was not inconsistent with substantial justice. Therefore, the erroneous admission of Woolverton's prior conviction of criminal threat does not require the reversal of his conviction for criminal threat.

In the second count, the State charged Woolverton with telephone harassment, which is defined as using a telephone to for the purpose of "making a telephone call, whether or not conversation ensues, or transmitting a telefacsimile communication with intent to abuse, threaten or harass any person at the called number." K.S.A. 21-4113(2).

Woolverton admitted on cross-examination that he thought calling someone a fucking whore was abusive. This testimony supports his conviction for telephone harassment, which only requires that he intentionally abuse a person at the called number, regardless of whether a conversation ensues. Thus, the admission of Woolverton's prior conviction for criminal threat was not inconsistent with substantial justice because the jury could have relied on Woolverton's testimony rather than his prior conviction to reach its verdict on the telephone harassment charge.

The district court improperly allowed the State to circumvent the motion in limine and introduce evidence of Woolverton's prior conviction to impeach Woolverton. However, the error was harmless. Thus, Woolverton's claim of error does not warrant the reversal of his convictions.

*Subject matter jurisdiction*

Next, Woolverton argues that the evidence is insufficient to establish the crime of criminal threat because the State failed to prove that the crime occurred in Kansas. Woolverton's argument essentially requires the court to determine whether Kansas has subject matter jurisdiction over a threat made while the declarant was in Missouri. Appellate courts review questions of subject matter jurisdiction using a de novo standard of review. *State v. Jackson,* 280 Kan. 16, 20, 118 P.3d 1238 (2005), *cert. denied* 164 L. Ed. 2d 1238 (2006).

To determine whether the district court had jurisdiction over the criminal threat charge in this case, the court must interpret the statute defining criminal threat and the statute establishing subject matter jurisdiction. The interpretation of a statute is a question of law subject to unlimited review. *State v. Kleypas,* 282 Kan. 560, 566, 147 P.3d 1058 (2006). The fundamental rule of statutory interpretation is that the intent of the legislature governs if that intent can be ascertained from the language of the statute. Ordinary words are given their ordinary meanings. *State v. McCurry,* 279 Kan. 118, 121, 105 P.3d 1247 (2005).

K.S.A. 21-3104 defines subject matter jurisdiction for a criminal prosecution as follows:

"(1) A person is subject to prosecution and punishment under the law of this state if:

(a) He commits a crime wholly or partly within this state; or

(b) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state; or

(c) Being outside the state, he commits an act which constitutes an attempt to commit a crime within this state.

"(2) An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within this state, the death is presumed to have occurred within the state."

K.S.A. 2006 Supp. 21-3419(a)(1) defines criminal threat as "any threat to . . . [c]ommit violence communicated with intent to terrorize another, or to cause the evacuation of any building, place of assembly or facility of transportation, or in reckless disregard of the risk of causing such terror or evacuation."

Relying on *State v. Cope*, 273 Kan. 642, 44 P.3d 1224 (2002), and *State v. Wright*, 259 Kan. 117, 122, 911 P.2d 166 (1996), Woolverton asserts that the act of criminal threat is complete when the threat is uttered. The *Cope* court held that the threat need not be real or capable of being carried out to satisfy the criminal threat statute. 273 Kan. at 647-49. In *Wright*, this court held that criminal threat does not require the defendant to know that his or her threat would be communicated to the person threatened. 259 Kan. at 122. Although *Cope* and *Wright* do not address the issue of subject matter jurisdiction for a criminal threat charge, Woolverton argues that these cases stand for the proposition that the court must focus on the speaker to determine the location of the crime. Because he was in Missouri when he uttered the threat, Woolverton claims that the State did not present sufficient evidence to establish that the crime occurred in Kansas.

The Court of Appeals concluded that Woolverton's argument is circular. 35 Kan. App. 2d at 488-89. Reasoning that *Cope* and *Wright* are inapposite, the Court of Appeals summarily concluded that "the result of the criminal threat offense occurred when Rotski heard the threat in Johnson County and became upset and called the police." 35 Kan. App. 2d at 491.

We agree with the Court of Appeals. Woolverton's reliance on *Cope* and *Wright* is misplaced. In *Cope*, the defendant was angry about a recent divorce in Johnson County. While in Johnson County, Cope told two of his coworkers that he planned to attack the Johnson County courthouse with C-4 explosives and automatic weaponry. Cope argued that there was insufficient evidence to support his conviction because there was no evidence that he could carry out the threat. The *Cope* court stated that the evidence regarding Cope's ability to carry out the threat was irrelevant in determining whether Cope made the threat with reckless disregard for the risk of causing the evacuation of the courthouse. 273 Kan.

at 649. *Cope* stands for the proposition that the threat does not have to be real or capable of being carried out. The key is the "communicator's reckless disregard of the possibility of creating that reaction which constitutes the offense." 273 Kan. at 648. However, *Cope* does not support the proposition that the crime is committed when the threatening words are uttered.

In *Wright,* the defendant argued that the complaint was defective because it did not allege that he knew his threat would be communicated to the victim. In holding that the threat need not be communicated to the victim, the *Wright* court merely acknowledges that a threat may be communicated to a third party rather than the victim. See 259 Kan. at 122. *Wright,* however, does not stand for the proposition that the threat is communicated when it is uttered.

Criminal threat, as it applies in this case, is defined as "any threat to: (1) Commit violence communicated with intent to terrorize another . . . or in reckless disregard of the risk of causing such terror." K.S.A. 2006 Supp. 21-3419(a)(1). The plain language of the statute proscribes the act of communicating a threat to commit violence. The verb communicate is defined as "[t]o express oneself in such a way that one is readily and clearly understood." The American Heritage Dictionary 299 (2d ed. 1985). The word "understood" means "perceived and comprehended." The American Heritage Dictionary 1318 (2d ed. 1985). Thus, the term "communicate" as used in K.S.A. 2006 Supp. 21-3419(a) requires a declarant and a receiver for the threat because the threat must be perceived and comprehended.

*Cope* and *Wright* are consistent with this interpretation of the term "communicate." In *Wright,* the threat was spoken by the defendant and perceived by a third party rather than the victim. Although the *Wright* court held that a third party could perceive the threat, its conclusion does not conflict with the requirement that someone must perceive the threat. See 259 Kan. at 122. The same is true for *Cope,* where the defendant's threats were spoken by the defendant and perceived by a third party in the county where the prosecution occurred. 273 Kan. at 648.

Pursuant to K.S.A. 21-3104(1)(a), the State has jurisdiction over any crime that is committed wholly or partly within Kansas. An offense is committed partly within this state if an act comprising a constituent and material element of the offense is committed within the state. K.S.A. 21-3104(2). Because the offense of criminal threat requires a communication, which involves both the declaration of a threat and the perception and comprehension of the threat, there are two acts comprising the constituent and material elements of the offense—speaking and perceiving. Although Woolverton spoke the threat in Missouri, Rotski perceived the threat at her home in Johnson County, Kansas. Thus, an act comprising a constituent and material element of criminal threat was committed in Kansas. The district court properly exercised subject matter jurisdiction over the offense of criminal threat as charged against Woolverton, and the State presented sufficient evidence to establish that an element of the crime occurred in Kansas.

*Admission of Woolverton's Statements*

Finally, Woolverton asserts that his confession should have been suppressed because he was not given *Miranda* warnings before the police questioned him. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). According to Woolverton, he was in custody when the Prairie Village detectives questioned him in the stairwell of his apartment complex. Woolverton points to the detective's threat to get a warrant if Woolverton did not cooperate to show that he was in custody.

An appellate court reviews the district court's decision on a motion to suppress evidence using a bifurcated standard. Without reweighing the evidence, the appellate court reviews the district court's findings to determine whether they are supported by substantial competent evidence. The appellate court then reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard. *State v. Rupnick*, 280 Kan. 720, 727, 125 P.3d 541 (2005).

*Miranda* warnings are required for all custodial interrogations. However, a law enforcement officer is only obligated to administer *Miranda* warnings when there has been such a restriction on the

suspect's freedom so as to render him or her in custody. Although the restriction of the suspect's freedom does not require a formal arrest, there must be a restraint on the individual's freedom of movement to the degree associated with a formal arrest. To determine whether an individual was in custody, a court must consider how a reasonable person in the suspect's shoes would have understood the situation. *Rupnick*, 280 Kan. at 740.

In *Rupnick*, investigators from the Kansas State Gaming Agency wanted to speak to Rupnick, an employee with the Sac & Fox Casino, about some computer disks containing information from Harrah's Casino. The investigators approached Rupnick at his workplace and requested to speak with him. Rupnick directed the investigators to his office and closed the door. Although the investigators did not specifically inform Rupnick that he was not free to leave or terminate the interview, the *Rupnick* court concluded that the Rupnick was not in custody. 280 Kan. at 740-41.

Likewise, in *State v. James*, 276 Kan. 737, 751, 79 P.3d 169 (2003), this court concluded that the defendant was not in custody when officers questioned him in a hospital waiting room and at the police station regarding the deaths of two dependent adults in his care. After taking the decedents to the hospital, James had been escorted to a private waiting room by hospital staff. When officers arrived to investigate the deaths, one was stationed outside the waiting room to maintain contact with James. An officer confirmed some preliminary information with James to identify the decedents and later asked James to go to the police station to talk to an investigator. James agreed to cooperate and willingly accompanied the officer to the police station. Although James was arrested on an outstanding warrant from Missouri, he was never restrained or deprived of his personal belongings, including his cell phone, during the interview. The *James* court concluded that *Miranda* warnings were not necessary because a reasonable person in James' situation would not have believed he or she was in custody. 276 Kan. at 753.

In this case, the district court found that Woolverton was approached by two Kansas detectives at his apartment in Missouri. Although the detectives did not take Woolverton into custody, they

told him they would get a warrant if Woolverton did not want to talk to them. Given a choice between being arrested later and talking with the detectives at that point, Woolverton chose to voluntarily speak with the detectives at his apartment complex. The detectives questioned Woolverton without restricting his ability to leave and told him that he could return to his apartment afterwards. Based on these factual findings, the district court concluded that Woolverton was not restrained of his freedom in such a way that a reasonable person would have thought he was in custody.

The district court's findings are supported by the record. The Prairie Village detectives approached Woolverton at Edward's apartment in Missouri and asked if they could talk to him. Woolverton asked if he had to talk with them right then, and the detectives told him they could leave and get a warrant to take him to the station to talk. To avoid being seen by his neighbors, Woolverton suggested that they talk in the stairwell. After introducing themselves and advising Woolverton of the purpose for the interview, the detectives informed him that he would not be arrested and could return to his apartment after the interview. Woolverton's girlfriend peeked into the stairwell during the interview, and Woolverton assured her that he was fine and would return to the apartment. After talking with the detectives for 30-45 minutes, Woolverton returned to his apartment.

The following testimony elicited during Woolverton's cross-examination at the suppression hearing supports the district court's finding that he voluntarily cooperated with the detectives:

"Q. . . . At any time during the interview, did they block you, put handcuffs on you, restrain you or keep you from leaving?
"A. Standing in front of the door.
"Q. Sir, did they do that?
"A. I cooperated.
"Q. Fair enough. And you testified that they threatened to go get a warrant, right?
"A. Yes.
"Q. So you knew they couldn't arrest you?
"A. I didn't know.
"Q. Well, sir, you certainly knew when they told you they had to go get a warrant, right?

"A.  I thought, Do I want more problems? Do I want to cooperate?"

When compared to the facts in *Rupnick*, the facts in this case support the conclusion that a reasonable person in Woolverton's situation would not have believed that he or she was in custody. Like Rupnick, Woolverton cooperated with the detectives when they requested to talk with him and directed the detectives to a place that was convenient for him. The *Rupnick* court concluded that a reasonable person in Rupnick's circumstances would have believed he was not in custody. 280 Kan. at 740-41. The similar facts in this case lead us to the same conclusion.

Likewise, the facts in *James* support the conclusion that Woolverton was not in custody. *James* illustrates a more restrictive, non-custodial environment than that experienced by Woolverton. See 276 Kan. at 751, 753. Unlike James, who was guarded to prevent him from leaving the hospital waiting room and arrested after the interview, Woolverton was not prevented from leaving the stairwell and was not arrested after the interview. Because the more restrictive environment in *James* was not custodial, we find no reason to conclude that Woolverton's interview was custodial.

Moreover, we note that even if the admission of Woolverton's statements had been error, the error would have been harmless. Melinda Edwards testified that she heard Woolverton threatening to kill Rotski. Woolverton also admitted threatening to kill Rotski during his direct examination. Thus, the evidence would have been before the jury regardless of the detective's testimony.

The district court's factual findings are supported by substantial competent evidence. These findings support the legal conclusion that Woolverton was not in custody during his interview. Thus, we conclude that the district court properly denied Woolverton's motion to suppress.

Finding no reversible error, we affirm Woolverton's convictions.

JOHNSON, J., not participating.

LOCKETT, J., Retired, assigned.