NOT DESIGNATED FOR PUBLICATION

No. 115,408

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT ROBERT BOLLIG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Trego District Court; GLENN R. BRAUN, judge. Opinion filed August 17, 2018. Affirmed.

*Daniel C. Walter* and *Aaron J. Herman*, of Walter & Walter, LLC, of Norton, for appellant.

*Jodi Litfin*, *Natalie Chalmers* and *Amanda G. Voth*, assistant solicitors general, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., ATCHESON, J., and WALKER, S.J.

ATCHESON, J.: In a recent opinion, we rejected—with a single reservation—Defendant Scott Robert Bollig's arguments for reversing his conviction for conspiring to commit first-degree murder. *State v. Bollig*, No. 115,408, 2018 WL 1976689 (Kan. App. 2018) (unpublished opinion) (*Bollig I*). We reserved ruling on Bollig's contention the Trego County District Court erred in denying his motion to suppress text messages law enforcement officials obtained from his smartphone. Those text messages figured prominently in proving the conspiracy to the jury. The district court failed to make

1

sufficiently detailed findings of fact and conclusions of law for us to review the point. We, therefore, remanded the suppression issue to the district court to make more detailed findings and conclusions. We otherwise retained jurisdiction of the case. 2018 WL 1976689, at *17-19.

After consulting with the parties, the district court made written findings and conclusions that have been added to the record on appeal. We now affirm the district court's original and reiterated ruling denying the motion to suppress the text messages because Bollig signed a valid consent for a search of his smartphone. In turn, the State properly used the text messages as evidence against Bollig during the trial. So we reject Bollig's remaining point on appeal for setting aside his conviction.

We briefly set out the basis for our decision. In doing so, we presume the reader's familiarity with *Bollig I*, where we outlined the underlying criminal conduct, recapped the procedural history of the prosecution, and disposed of the other appellate issues. In *Bollig I*, we also recounted the testimony at the suppression hearing describing the encounter between Bollig and the law enforcement officers at the WaKeeney police station that yielded his signed consent. Much of what happened at the police station was undisputed. But Bollig's testimony and that of the officers differed in several material respects. In short, Bollig's account might have supported a finding that his consent was less than voluntary. See *Bollig I*, 2018 WL 1976689, at *14, 19.

We review a district court's ruling on a suppression motion using the well-known bifurcated standard that accepts factual findings if they are supported by competent evidence having some substance and accords plenary review to legal conclusions based on those findings, including the ultimate disposition of the motion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). We owe particular deference to the district court's credibility determinations. *State v. Appleby*, 289 Kan. 1017, 1038, 221 P.3d 525 (2009). The State bears the burden

2

of proving a search or seizure to be constitutionally permissible by a preponderance of the evidence. *Patterson*, 304 Kan. at 274; *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008).

Bollig testified at the suppression hearing that Kansas Bureau of Investigation Agent Kevin Campbell and WaKeeney Police Chief Terry Eberle promised him beneficial considerations that induced him to sign the consent to search. Bollig asserted the officers promised him he could have his smartphone back the next day if he signed the consent and, more broadly, that nothing would happen to him if he cooperated. Campbell and Eberle testified that they made no such promises to Bollig. On remand, the district court specifically determined the officers to be more credible than Bollig on this point. Especially given the standards of review, we necessarily accept that determination, since the district court had the opportunity to observe the witnesses as they testified. See *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) ("[T]he ability to observe the declarant is an important factor in determining whether he or she is being truthful."). The district court's credibility finding undercuts Bollig's principal argument for invalidating the consent to search.

The district court also made detailed findings about how Campbell and Eberle conducted the meeting with Bollig at the police station before he signed the consent. Those findings draw on mostly undisputed testimony and in all material respects parallel the description of the meeting set out in *Bollig I*. We do not recount those details here. The district court found the law enforcement officers did not trick, threaten, or otherwise coerce Bollig into signing the consent. In other words, the district court concluded that Bollig knowingly and voluntarily consented to the search of his smartphone. Substantial evidence supports the factual findings, and we agree with the legal conclusion.

A court assesses the voluntariness of a consent by looking at the totality of the circumstances. In *State v. Thompson*, 284 Kan. 763, 811, 166 P.3d 1015 (2007), the court

highlighted factors bearing on voluntariness that typically can and should be accounted for in an assessment of the circumstances. See also *State v. Reiss*, 299 Kan. 291, 298, 326 P.3d 367 (2014) (reiterating and applying factors outlined in *Thompson*, 284 Kan. at 811). The factors perform double duty in that they may be used in looking at the coercive character of a citizen-police encounter generally and the voluntariness of a consent to search specifically. *Thompson*, 284 Kan. at 811-13. The *Thompson* factors suggesting the absence of overbearing law enforcement pressure are: (1) an officer's "clear communication" to the citizen that he or she is "free to terminate the encounter or refuse to answer questions"; (2) the citizen's knowledge from some other source of his or her right to refuse; (3) the return of a driver's license or similar documents, such as vehicle registration or insurance card, to the citizen; and (4) "a physical disengagement," meaning some reasonably understood statement or signal from an officer to the citizen that he or she is free to leave. 284 Kan. at 811. Factors indicative of undue coercion are: (1) "the threatening presence of several officers"; (2) an officer's display of a weapon or continued use of emergency lights on a law enforcement vehicle; (3) an officer's direct physical contact with the citizen; (4) an officer's use of "aggressive language or tone of voice" communicating a need to comply; (5) the "prolonged retention" of a citizen's driver's license or other documents; (6) an officer's request that the citizen accompany the officer to another place; and (7) an encounter occurring in a nonpublic place or under other circumstances where the law enforcement officer's conduct is unlikely to be witnessed by other citizens. 284 Kan. at 811. We mentioned the *Thompson* factors in *Bollig I* but did not apply them, since we lacked factual findings from the district court. 2018 WL 1976689, at *15, 17.

The tenor of meeting at the police station was businesslike. Bollig met the officers at the police station at midmorning. He was neither arrested nor physically restrained and left about two hours later after reviewing and signing written consents for both his smartphone and his computer. As we pointed out in *Bollig I*:

4

"Bollig specifically testified he signed the consent because he was promised his smartphone would be returned the next day and that nothing bad would happen to him if he cooperated. He did not claim he signed because his will had been broken by a threatening or coercive atmosphere from which he felt unable to escape or in which he felt his physical safety was in jeopardy." 2018 WL 1976689, at *18.

In sum, Bollig was neither induced with beneficial promises nor subjected to coercive or threatening tactics causing him to sign the consent to search his smartphone. The written consent was legally valid. And the district court, therefore, properly denied Bollig's motion to suppress the text messages recovered from the smartphone. Since Bollig's Fourth Amendment rights were not violated, the district court also properly found no constitutional grounds to preclude the admission of the text messages at trial.

To tie up loose ends, we return to Bollig's alternative challenge to the search of his smartphone based on purported deficiencies in the execution of a search warrant for the device. See *Bollig I*, 2018 WL 1976689, at *19. Despite the signed consent, KBI agents later obtained a search warrant for the smartphone. In *Bollig I*, we declined to address the arguments directed at the search warrant because, in some respects, they presented novel and potentially difficult legal issues. And if Bollig's written consent were valid, it would provide an independent and legally adequate basis to search the smartphone. See 2018 WL 1976689, at *19.

Given our determination that Bollig, in fact, validly consented to the search of the smartphone, we have no need to consider his arguments directed at the warrant. They are superfluous and functionally moot. An issue is moot if its resolution would not alter the legal relationship of the parties. Courts should decline to decide moot issues, since their resolution is purely advisory. See *In re Care & Treatment of Kukovich*, No. 114,209, 2016 WL 7031851, at *1 (Kan. App. 2016) (unpublished opinion) ("Courts refrain from deciding moot issues because any ruling effectively amounts to an impermissible

5

advisory opinion."). Our declination in *Bollig I* was appropriate then, and it continues to be so now.

We affirm Bollig's conviction and sentence for the reasons stated in *Bollig I* and supplemented here.