NOT DESIGNATED FOR PUBLICATION

No. 125,701

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

QUENTIN DERREL BLACKMAN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Submitted without oral argument. Opinion filed May 3, 2024. Affirmed.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Kristi D. Allen*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before COBLE, P.J., GREEN, J., and TIMOTHY G. LAHEY, S.J.


PER CURIAM: Quentin Derrel Blackman was charged and convicted of criminal threat after making comments to multiple Sedgwick County Sheriff's deputies on separate occasions. Blackman now appeals two of those convictions, arguing the State failed to present sufficient evidence to find him guilty of criminal threat against two of the deputies. Reviewing the record in the light most favorable to the State, as required, we must affirm Blackman's convictions.

1

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Blackman with four counts of intentional criminal threat under K.S.A. 2021 Supp. 21-5415(a)(l) for statements he made to four deputies of the Sedgwick County Sheriff's Office. The case proceeded to jury trial, where all four Sedgwick County deputies testified to the events leading to the criminal charges.

Deputy Kyle Jackson was called as the State's first witness. He testified that on the night of September 3, 2021, he conducted a traffic stop involving a vehicle in which Blackman was a passenger. The officer noticed Blackman was not wearing a seatbelt, and when he asked for Blackman's identification, Blackman refused to identify himself and became loud. Deputy Jackson then radioed for assistance, and after Deputy Scott McCall—now Detective McCall—responded, Blackman was arrested for obstruction when he continued to refuse to provide his name or identification to either officer. Deputy Jackson eventually transported Blackman to jail, during which time Blackman was being irate and yelling, and multiple times said "I got something" for Deputy Jackson. The deputy also told the court that Blackman said his family, specifically his uncle Anthony Ray Martin, is known for "taking out pigs." Blackman said he planned to roll up to Deputy Jackson's house and show him, and he would "find out." Once out of the patrol vehicle, Blackman told Deputy Jackson that he would fight him and the two other officers. The State played Deputy Jackson's body camera video from the incident at trial.

The State next called Deputy Wesley Julian as a witness. Deputy Julian testified he encountered Blackman when he escorted Blackman from the residential pod of the Sedgwick County Jail to the jail clinic on September 20, 2021. Blackman asked Deputy Julian if he knew Deputy Jackson, then told the deputy he wanted to kill Deputy Jackson. Deputy Julian told the court he asked Blackman to clarify, and Blackman again looked Deputy Julian in the eye and said, "[S]eriously, I am going to kill Deputy Jackson."

2

Deputy Julian testified that after he finished escorting Blackman, he notified his supervisor and documented the encounter, and that he feared Blackman may hurt Deputy Jackson.

Detective McCall was called as the State's third witness. Detective McCall stated that along with the original traffic stop, he encountered Blackman in the Sedgwick County Jail on September 25, 2021, when he was called to assist because Blackman refused to return to his room. Blackman asked if Detective McCall remembered him. When Detective McCall answered yes, Blackman stated he was going to "fuck dude up." Detective McCall testified he asked if Blackman was speaking about him and Blackman said no, but Blackman continued to say that individual was "on some bullshit." Detective McCall explained that he inferred Blackman was referring to Deputy Jackson because the only other interaction he had with Blackman was during the incident with Deputy Jackson. Detective McCall testified he understood Blackman's statement to mean Blackman planned to harm Deputy Jackson, and he feared for Deputy Jackson because he was afraid Blackman may act on those threats. The jury viewed the video footage from the body camera worn by another officer during this encounter.

The State next called Deputy Garreth Adams as a witness. Deputy Adams testified that he encountered Blackman in the Sedgwick County Jail when he had to escort Blackman from the residential pod to the jail clinic for medical reasons on October 4, 2021. Deputy Adams stated that Blackman told him that he wanted to kill Deputy Jackson. Deputy Adams told the court that once he heard Blackman's statement, he turned on his body camera and when he asked Blackman what he said, Blackman refused to say it again because the camera was activated. Blackman asked if Deputy Adams knew who he was talking about and Deputy Adams answered yes and confirmed he was referring to Deputy Jackson, at which time Blackman said, "Fuck him." The State played at trial the video recording from Deputy Adams' body camera. Deputy Adams testified that he was in fear that Blackman may act on the threat toward Deputy Jackson.

Blackman also took the witness stand at trial. Blackman testified he did not remember what he said in the back of Deputy Jackson's patrol vehicle because he was too frustrated, irritated, and was on drugs. Blackman said he remembered saying something about being outside Deputy Jackson's house when he got to the jail. Blackman testified that he was "just shooting shit" with Detective McCall when he talked to him because he talked to Detective McCall two or three times before. Blackman stated he did not remember threatening or saying he planned to kill anyone. Blackman explained he remembered saying "crazy shit," like "he's a bitch," but he did not recall making statements of threat or scaring anyone. He also testified that he did not intend Deputy Jackson to find out about anything he said.

During cross-examination by the State, Blackman admitted he said things to Deputy Jackson, but it was just meant to "piss [him] off." He also explained that when he mentioned his uncle's name and said his family was known for "knockin' out ya'll pigs," he was just talking and trying to make Deputy Jackson upset or get a reaction out of him. Blackman said when he made the statement about showing up at Deputy Jackson's house, he meant it in a way to show how the officer might feel if someone followed him around and waited outside his house, but Deputy Jackson took it the wrong way. Blackman also testified that he did not tell Deputy Julian that he would kill Deputy Jackson but did say that he was going to "beat that nigga ass," because he should not have pulled him over. Blackman did not deny telling Detective McCall that he was going to "fuck dude up" or "fuck up dude," but he explained that he was "just shootin' shit with him," because he heard that Detective McCall was trying to build a case on him. He said he was just talking, not trying to "put fear in nobody." Blackman said he did not say he was going to kill Deputy Jackson when he talked to Deputy Adams. But he did say he was going to "fuck dude up" and he did not think they would tell Deputy Jackson. Blackman denied making any statements to the effect that he was going to harm Deputy Jackson once he was out of handcuffs or out of jail.

4

The jury convicted Blackman of three counts of criminal threat—against Deputy Jackson, Detective McCall, and Deputy Adams—and acquitted Blackman of one count of criminal threat against Deputy Julian. Blackman moved the court for a judgment for acquittal and for a new trial, which the district court denied. Blackman also filed a motion for departure, which the district court denied for lack of substantial and compelling reasons. Blackman was sentenced to 31 months in prison with a postrelease supervision term of 12 months to run consecutively to all other cases.

Blackman filed an untimely notice of appeal; however, the district court granted Blackman's motion to file his notice of appeal out of time.

### SUFFICIENT EVIDENCE EXISTED TO CONVICT BLACKMAN OF INTENTIONAL CRIMINAL THREAT AGAINST DETECTIVE MCCALL AND DEPUTY ADAMS

Blackman argues the State presented insufficient evidence to show he communicated criminal threats to Detective McCall and Deputy Adams with the intent to place them in fear. Instead, he maintains the evidence established he only intended to place Deputy Jackson in fear by communicating threats against him through Deputies McCall and Adams.

*Applicable Legal Principles*

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

"This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

*Sufficient evidence supports Blackman's conviction.*

As Blackman points out, the State has the ultimate duty to present evidence proving each element of the crime beyond a reasonable doubt. *State v. Buchanan*, 317 Kan. 443, 454, 531 P.3d 1198 (2023). Blackman was charged with criminal threat under K.S.A. 2021 Supp. 21-5415(a)(1), which provides, in relevant part, that a "criminal threat is any threat to . . . [c]ommit violence communicated with intent to place another in fear."

In line with this statute and Pattern Instruction Kansas PIK Crim. 4th 54.370 (2020 Supp.), the district court included the following in its jury instructions, identical aside from each charge number, officer's name, and date:

"Instruction [7 and 8]
"In Count [Three and Four], the defendant is charged with Criminal Threat. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
1. The defendant threatened to commit violence and communicated the threat with the intent to place [Deputy McCall or Deputy Adams] in fear.
2. This act occurred on or about [September 25th or October 4], 2021, in Sedgwick County, Kansas.
"The State must prove that the defendant acted intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

Blackman claims the State failed to present evidence that it was his intent to place either Detective McCall or Deputy Adams in fear. In support, he solely relies on an unpublished opinion from another panel of this court, *State v. Williams*, No. 106,645,

6

2013 WL 4564749 (Kan. App. 2013) (unpublished opinion). There, Williams was convicted of two counts of intentional criminal threat based on his threat to harm a local judge. Williams made the threatening statement referenced in count one of the complaint in the presence of a third party and not directly to the judge. A panel of this court reviewed whether the conviction should be vacated for insufficient evidence in part because the jury instruction on count one allowed the jury to alternatively find that the third party was also terrorized by the threatening statement made towards the judge. The State argued that as the person who perceived Williams' threat against the judge, the third party necessarily also became a target of the threat.

The *Williams* panel held that "to prove a *particular individual* is the target or intended victim of the threat, there must be evidence to establish that the defendant uttered a threat to commit violence with the intent to terrorize *that particular individual*." 2013 WL 4564749, at *3. The panel then found proving the third party perceived the threat does not also prove the third party was the target of the threat, and the threat against the judge was not sufficient to terrorize the third party. 2013 WL 4564749, at *3-4. Although the panel found insufficient evidence to establish a criminal threat against the third party, it did not reverse Williams' conviction as the jury instruction required finding of a criminal threat against the judge *or* the third party, and the panel found sufficient evidence to support the criminal threat against the judge. 2013 WL 4564749, at *4. On review, our Supreme Court did not address the sufficiency of evidence issue. *State v. Williams*, 303 Kan. 750, 754, 368 P.3d 1065 (2016).

Blackman argues we should adopt the *Williams* rationale and reverse his convictions because the jury could not find Detective McCall and Deputy Adams were placed in fear by the communicated threat—that is, Blackman allegedly uttered the threats only with the intent to cause fear in Deputy Jackson. Even if both McCall and Adams heard and understood the threats, they were not the intended victims. But we find Blackman's application of *Williams* is flawed.

7

First, *Williams* is distinguishable on its facts because unlike here, the third-party receiver of the statement in *Williams* specifically testified Williams did not threaten her, which other trial testimony supported. We do not have the same situation before us. Here, both Detective McCall and Deputy Adams testified that they were in fear when Blackman made the threatening statements against Deputy Jackson.

And Blackman neglects to analyze our Supreme Court's review of the *Williams* case. Although it did not review the sufficiency of the evidence issue, the court addressed the claim on count one as a multiple acts or alternative means issue. In doing so, the court found it irrelevant whether a jury believes the defendant threatened the present third party or the intended victim because the statute only requires that the threat be communicated to another non-case-specific person, which included both the judge and the third party. 303 Kan. at 757-58. The court explained the Kansas Criminal Code defines "'another'" as "'a person or persons as defined in this code other than the person whose act is claimed to be criminal.'" 303 Kan. at 757; see K.S.A. 21-5111(b). "Simply put, the crime can be committed by communicating a threat of violence to one person or a thousand people," so long as the jury agrees the defendant threatened another person. 303 Kan. at 757.

Although our prior panel's opinion in *Williams* may offer Blackman some support, we may disagree with another panel. *State v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018). Even more, we find the rationale of the Kansas Supreme Court not only more persuasive, but we are bound by decisions of our high court. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022) (The Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position.).

While a threat under K.S.A. 21-5415 must be communicated through words or actions and perceived by someone, it need not apply specifically to either the intended witness or intended victim. See *State v. Quinones*, 42 Kan. App. 2d 48, 54-55, 208 P.3d

8

335 (2009) (analyzing a witness intimidation case through analysis of the criminal threat statute) (citing *State v. Woolverton*, 284 Kan. 59, 69, 159 P.3d 985 [2007] [the threat must be perceived and comprehended]; *State v. Wright*, 259 Kan. 117, 122, 911 P.2d 166 [1996] [criminal threat does not require the State to prove that the defendant knew the threat would be communicated to the victim]).

For example, if a defendant communicated a threat to harm an infant to its mother, the infant would neither comprehend the threat nor be placed in fear. According to Blackman's argument this would not satisfy the requirements to establish a criminal threat. Yet, according to the statute, the crime of criminal threat is satisfied because the mother—"another" under K.S.A. 21-5415(a)(1)—would be placed in fear for her child's life. Likewise, as the Supreme Court articulated in *Williams*, a rational conclusion here requires the State to prove that Detective McCall and Deputy Adams were placed in fear, regardless of whether they were the targets of the threat, when Blackman communicated the threat to harm Deputy Jackson. *Williams*, 303 Kan. at 757; see K.S.A. 21-5415.

Given the evidence presented at trial, a rational jury could conclude that Blackman made threatening statements intended to place Detective McCall and Deputy Adams in fear. Both Detective McCall and Deputy Adams specifically testified that Blackman's threats against Deputy Jackson put them in fear. True, the jury also heard Blackman testify he was "just shootin' shit." But, as stated above, it is not the role of this court on appeal to reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *Aguirre*, 313 Kan. at 209. That is the role of the jury, so we do not weigh the veracity of the officers' testimony against Blackman's. Rather, we must view the evidence before us in the light most favorable to the State. Again, only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict. *Meggerson*, 312 Kan. at 247.

Reviewing the record under that rigorous standard, we cannot say that no reasonable jury could find Blackman guilty. Instead, we must conclude that a rational fact-finder could determine Blackman intentionally made criminal threats against Detective McCall and Deputy Adams.

Affirmed.