No. 87,974

STATE OF KANSAS, *Appellee*, v. CEDRIC D. JAMES, *Appellant.*

(79 P.3d 169)

Opinion filed November 26, 2003.

*Sandra Carr,* assistant appellate defender, argued the cause and was on the brief for appellant.

*W. Scott Toth,* assistant district attorney, argued the cause, and *Steven J. Obermeier,* assistant district attorney, *Paul J. Morrison,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: A Johnson County District Court convicted Cedric D. James of two counts of involuntary manslaughter on May 30, 2001, and sentenced him to two consecutive 34-month terms of imprisonment. He raises two issues in his direct appeal: (1) Did the district court have jurisdiction over the charged offenses, and (2) did the district court err in failing to suppress his statements to police?

Our jurisdiction is pursuant to K.S.A. 20-3018(c), transfer on our own motion, and we affirm.

## FACTS

In the summer of 2000, Cedric James began working as a teacher for Community Living Opportunities (CLO), an organization which provides day and residential care services for developmentally disabled adults. CLO operates several residences in the Kansas City, Kansas, area, and each of these is home to three to eight adults.

As a CLO teacher, James was responsible for monitoring and assisting residents in their daily living tasks. When he arrived in the mornings, he assisted with the residents' routine of showering, brushing their teeth, eating breakfast, and preparing for daily activities. For several Saturdays beginning in July 2000, he had taken some of the residents of CLO's South Park facility in Merriam, Kansas, with him on afternoon outings. He explained to his coworker Kimberly Mayeo that he used this time to supplement his income by cutting people's hair. Jennifer Thomas, his supervisor at the South Park facility, knew this information prior to September 2, 2000.

On September 2, 2000, James asked Thomas for permission to take two developmentally disabled adult residents, Michael O'Neal and Steven Warren, out for the afternoon. James mentioned that he would take the residents to a Wendy's restaurant and then pos-

sibly to another CLO facility that was located only a few blocks away. Thomas approved these travel plans.

According to the supervisor of the residential program at CLO, Michaela Ross-Ward, the individuals whom CLO serves, especially O'Neal and Warren, are dependent upon the caregivers, including James, for almost everything that they do. Though both O'Neal and Warren were nonverbal, they followed directions well. Ross-Ward testified that she was not aware of their ever going against someone's instruction to stay put until that person returned.

The South Park facility had two vehicles, but the air conditioners in both worked poorly. The larger vehicle's air conditioner did not work when it was running idle, and the smaller vehicle's air conditioner would work for about an hour before failing. Thomas instructed James to use the smaller car, the red Mercury Tracer station wagon. At approximately 1 p.m., James drove the station wagon away from South Park with O'Neal and Warren as his backseat passengers. The rear passenger doors contained child safety locks, which meant they could not be opened from inside the car.

When James later spoke to police investigating the case, he provided the following version of events. He first went to his home on Hillcrest Road in Kansas City, Missouri, to cut a neighbor's hair. When his appointment did not arrive, James went to his cousin's apartment at Brittany Pointe in Kansas City, Missouri, arriving between 1:15 and 1:30 p.m. Following a short visit, he drove O'Neal and Warren to a Wendy's restaurant and bought them food. After eating in the restaurant parking lot, the three went to Swope Park in Kansas City, Missouri, arriving between 2:30 and 3 p.m. After driving around in the park and stopping once under covered parking, they arrived at the entrance to the park off 71st Street near the Swope Park Frisbee golf course. James left the car, smoked several cigarettes about 50 feet away, and talked to a man playing Frisbee golf. After spending as much as an hour outside the car, James noticed that Warren had fallen over O'Neal in the car's back seat and ran to assist them. James told police that he attempted first aid on Warren, but Warren was not responsive. James then drove to the Shawnee Mission Medical Center in Merriam, Kansas,

to seek medical assistance at the only medical facility he knew of in the area.

James arrived at the center at approximately 5 p.m. and entered the emergency room to request assistance. Sandi Jo Hudson, the admitting nurse, followed James to his car and immediately noticed that the two passengers in the back seat appeared to be in very grave condition. Neither man was breathing, and both were extremely red and warm to the touch. The skin on the sides of their faces had begun to blister and peel. Hudson testified that in response to her questions, James claimed O'Neal and Warren had stopped breathing only 5 minutes prior to their arrival at the medical center, although James also told her that the men were unresponsive from the moment he returned to the car at Swope Park.

After Hudson completed her triage of the two patients, she returned to the triage waiting area. She noticed James was anxious and pacing and that other patients were being disturbed by his conduct. In an effort to calm him, Hanson escorted him to a quiet, private waiting room.

Hudson did not declare the men to be dead on arrival. The men were later declared dead at the medical center by two attending physicians. Subsequent autopsies concluded that O'Neal and Warren died of environmental hyperthermia. The temperature that day was over 100 degrees Fahrenheit. The record on appeal does not reveal that any physician determined the precise times of the deaths.

Corporal Darren McLaughlin of the Merriam police department arrived at the medical center around 5 p.m. According to McLaughlin's testimony, a physician informed him of the deaths and that James was in a private waiting room. McLaughlin then posted an officer outside the waiting room to keep contact with James. Approximately 15 minutes after McLaughlin's arrival, he approached James and for about 5 minutes asked for preliminary identifying information and questioned him to confirm the information the physicians had provided. After speaking further with medical staff members and his superiors, McLaughlin returned to the waiting room 30 to 45 minutes later and asked James if he would be willing to go to the Merriam police station to speak with

an investigator. According to McLaughlin, James agreed to cooperate and voluntarily went to the station.

At 7:30 p.m., an hour after James arrived at the police station, Detective Michael Daniels spoke with James to gain information about the incident and to determine whether his department had jurisdiction to continue the investigation. Daniels testified that when James arrived at the station, Daniels did not believe a crime had been committed and that James was not in custody. James was merely considered a witness. Daniels explained that the officers did not restrain James in any way and they allowed him to retain all of his personal possessions including a cellular phone and pager. According to Daniels, if James had been under arrest, this omission would have been a violation of the department's security protocol.

Daniels testified that during one of the several breaks in his questioning of James at the station, he left the door to the interview room open. When James used his cell phone to call his cousin, James pushed the door shut. After asking an officer in the hallway for permission, he was able to leave the interview room to use the restroom and to get a drink of water.

Daniels confirmed that during questioning, James asked several times if he would be going home. Daniels responded, "Well, do you want to keep talking to me?" James started talking again, so Daniels assumed that he was not asking to leave but asking if he would be going home after the interview. Halfway through the interview, James directly asked if he was under arrest. When Daniels told him that he was not under arrest, James "kind of clapped his hands" and said, "Good."

Daniels testified that James mentioned several times that he had talked to an attorney and the attorney told him not to talk but James said he wanted to talk to Daniels anyway. According to Daniels, James never requested to speak to an attorney.

At the end of his interview with James, Daniels was not able to determine whether a crime had been committed. Daniels learned of a Missouri warrant for James' arrest prior to the interview but did not know if the specific warrant was extraditable. Daniels instructed another officer to determine the type of warrant. After approximately 30 minutes into the interview, Daniels learned that

it was a felony warrant and that the police would have to hold James for Missouri. James was not told about the warrant until the 80-minute interview was concluded. According to Daniels, but for the Missouri warrant James would have been free to leave. After the interview was completed, the Merriam police arrested James on the warrant.

James testified at the hearing on the motion to suppress that when the hospital staff directed him to the waiting room, he felt that he was not free to leave. After speaking with the hospital's chaplain for a few moments, James tried to exit the waiting room and was prevented from leaving by an officer posted at the door who put his hand up and said, "No. We need to wait for you to talk to a detective." James did not try to leave again, but he called his cousin and his attorney from the hospital room. When Mc-Laughlin arrived, James asked whether he could leave, and he was told, "No. We just want you to talk to the investigator."

James testified that McLaughlin did not give him the option of refusing to go to the Merriam police station. Officers entered the waiting room and informed him, "We're going to the Merriam Police Department because it would be better to talk there." James felt compelled to comply because several police officers walked behind and beside him and gestured for him to go to the waiting police car. James asked if he was under arrest and was told, "No. We just want to take you down and talk to you." James admits that McLaughlin never told him he was under arrest.

According to James, once he arrived at the police station, officers again directed him to an interview room with an officer seated outside the door. When Daniels arrived 30 to 60 minutes later, James asked if he was under arrest; Daniels told him that he was not. James asked several times if he was free to go home, and Daniels replied that he just wanted to find out what happened. James felt that he could not leave and go home, but he later admitted that he never told Daniels he wanted to stop the interview. According to James, at the end of the interview Daniels said, "You're free to leave." At no time had James been handcuffed. As James and Daniels walked through the station, James was arrested on the Missouri felony warrant.

Following the interview, Detective Daniels conducted an investigation to confirm James' story. After reviewing James' cellular telephone records, he determined James made numerous calls during the time he was caring for O'Neal and Warren. Daniels discovered by analyzing cellular phone tower records that during the time James claimed to be in Swope Park, he actually had used his cellular phone from a location west of the park, consistent with the address of his apartment complex.

Daniels then spoke to several tenants of James' apartment complex, including Shawn Randolph. Randolph later testified that, though he was not at home in the early afternoon of September 2, 2000, on several occasions during the summer he had observed CLO's vehicle parked in his apartment complex's parking lot. Each time he saw the red station wagon its engine was running, the windows were rolled up, and several mentally disabled persons sat inside. Randolph testified that although the car would usually remain in the complex parking lot for 2 or 3 hours, he never determined who the driver was.

Based on Detective Daniels' investigation, the State charged James with involuntary manslaughter, in violation of K.S.A. 2002 Supp. 21-3404, under three different theories. The State claimed James unintentionally killed O'Neal and Warren:

1. Contrary to 21-3404(a), by acting recklessly;
2. Contrary to 21-3404(b), by committing a felony enacted for the protection of human life or safety, *i.e.*, 21-3437(a)(1) (mistreatment of a dependent adult through unreasonable confinement); and
3. Contrary to 21-3404(b), by committing a misdemeanor enacted for the protection of human life or safety, *i.e.*, 21-3437(a)(3) (mistreatment of a dependent adult by omitting or depriving the adult of treatment, goods, or services necessary to maintain the adult's physical or mental health).

James consented to the submission of the case to the district court for trial upon all the evidence from the preliminary hearing. After overruling James' motions to dismiss for lack of jurisdiction and to suppress his statements to McLaughlin and Daniels, the

district court found him guilty of two counts of involuntary manslaughter under all three theories.

## ANALYSIS

Issue 1: *Did the district court have jurisdiction over the charged offenses?*

James argues the Johnson County District Court did not have territorial jurisdiction. Whether a court has jurisdiction over a matter is a question of law over which this court has unlimited review. *State v. Jacques*, 270 Kan. 173, Syl. ¶ 11, 14 P.3d 409 (2000).

The Kansas criminal territorial jurisdiction statute, K.S.A. 21-3104, provides in relevant part:

"(1) A person is subject to prosecution and punishment under the law of this state if:

(a) *He commits a crime wholly or partly within this state*; or

(b) Being outside the state, he counsels, aids, abets or conspires with another to commit a crime within this state; or

(c) Being outside the state, he commits an act which constitutes an attempt to commit a crime within this state.

"(2) *An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within this state, the death is presumed to have occurred within the state.*"

"(3) A crime which is based on an omission to perform a duty imposed by the law of this state, is committed within the state, regardless of the location of the person omitting to perform such duty at the time of the omission." (Emphasis added.)

The district court determined that jurisdiction existed pursuant to the provisions italicized above. It first reasoned that material elements of the offense of involuntary manslaughter, under each of the three theories, occurred in Kansas. K.S.A. 21-3104(2). It next reasoned that both victims were "found" dead in Kansas. K.S.A. 21-3104(2). James argues that the district court erred because all his wrongful conduct occurred in Missouri, the State could not establish that the deaths occurred in Kansas and the statutory presumption based upon finding the body in Kansas does not apply to the circumstances of this case.

We need not examine these arguments, however, because jurisdiction is more clearly established by K.S.A. 21-3104(3). While the

district court concluded James had committed a crime of omission by depriving the decedents of his services as a caretaker under K.S.A. 21-3437(a)(3), it did not take the next step of using that omission to establish jurisdiction under K.S.A. 21-3104(3). We do so now under the general authority of *Dickerson v. Kansas Dept. of Revenue,* 253 Kan. 843, Syl. ¶ 3, 863 P.2d 364 (1993) (district court's conclusion that it could exercise jurisdiction was correct, although reasons stated for conclusion were not, since district court's reasons for its decisions are immaterial if ruling was correct for any reason).

Our determination that James' crime is one based upon such an omission requires several analytical steps.

First, we examine the statute for involuntary manslaughter, the crime of which James was convicted. K.S.A. 2002 Supp. 21-3404 states in relevant part:

"Involuntary manslaughter is the unintentional killing of a human being committed:

. . . .

"(b) in the commission of, or attempt to commit . . . any felony . . . that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety . . . ."

Second, we examine K.S.A. 21-3437, the crime cited by the district court as underlying the conviction for involuntary manslaughter because the deaths occurred during the commission of a felony or misdemeanor enacted for the protection of human life or safety. This statute defines the crime of mistreatment of a dependent adult and states in relevant part:

"(a) Mistreatment of a dependent adult is knowingly and intentionally committing one or more of the following acts:

. . . .

(3) *omitting or depriving treatment, goods or services* by a caretaker or another person which are necessary to maintain physical or mental health of a dependent adult.

. . . .

"(d) Mistreatment of a dependent adult . . . as defined in subsection . . . (a)(3) is a class A person misdemeanor." (Emphasis added.)

K.S.A. 2002 Supp. 21-3404(b) reveals that involuntary manslaughter includes committing a misdemeanor which is enacted for

the protection of human life or safety. Subsections (a)(3) and (d) of 21-3437 make omission or deprivation of treatment, goods, or services by a caretaker which are necessary to maintain physical or mental health of a dependent adult a class A person misdemeanor. Kansas law defines "dependent adult" as "an individual 18 years of age or older who is *unable to protect their own interest*." (Emphasis added.) K.S.A. 21-3437(c). As a result, they are reliant upon their caretakers to protect their interest. We therefore agree with the district court that the criminal statute K.S.A. 21-3437 is designed to protect human life or safety.

This determination also helps support our conclusion that jurisdiction exists under K.S.A. 21-3104(3), *i.e.*, for a crime which is based on an omission to perform a duty imposed by the law of this State. As previously noted, adults in Kansas who are unable to protect their own interest are dependent upon their caretakers. It logically follows that their caretakers possess an affirmative duty to provide this protection. Accordingly, a caretaker's omission or deprivation of treatment, goods, or services which are necessary to maintain a dependent adult's physical or mental health is not only a crime under K.S.A. 21-3437(a)(3), but more importantly it is also a crime based on the omission to perform a duty imposed by the law of this State under K.S.A. 21-3104(3). See *People v. Caruso,* 119 Ill. 2d 376, 519 N.E.2d 440 (1987), *cert. denied* 488 U.S. 829 (1988) (An omission to perform a duty forms the foundation or essence of an offense if to perform the offense requires the accused to fail to perform his or her affirmative duty as imposed by the law of this State.).

The facts reveal that James deprived two residents of an adult care home—who were entrusted to his care and entirely dependent upon that care for all but the simplest tasks—of treatment or services necessary to maintain their physical or mental health. This deprivation violated his duty to them as imposed by Kansas law. Although James' conduct was not as clearcut as if he had withheld their life-supporting prescription medication, he nevertheless deprived O'Neal and Warren of services, *i.e.*, the considerable attention, direction, and supervision that they required. Evidence in the record indicates they would not have left the car until James had

returned and granted them permission. Even assuming they had been mentally capable of exercising some independent action by attempting to exit the car without his permission, other evidence indicates the child safety locks would have prevented their escape. Moreover, once James discovered their dire condition, he failed to timely provide adequate treatment or services which might have saved their lives. Exactly where his criminal conduct occurred, Kansas or Missouri, is irrelevant to our conclusion that jurisdiction exists under K.S.A. 21-3104(3) ("A crime which is based on an omission to perform a duty imposed by the law of this state, is committed within the state, regardless of the location of the person omitting to perform such duty at the time of the omission.").

Our decision is well supported by Kansas law. K.S.A. 21-3104 was passed by the Kansas Legislature in 1969 as part of a comprehensive revision to the criminal code. L. 1969. ch. 180, sec. 21-3104. The Kansas Judicial Council notes from 1968 state that subsection (3) clarifies the status of the negative act done outside the State. See K.S.A. 21-3104 (Ensley 1988). While these notes express that the subsection is particularly applicable to child desertion cases and that it restates the view that has long been taken in Kansas, subsection (3) has been applied to another context.

In *State v. Jones*, 9 Kan. App. 2d 106, 673 P.2d 455 (1983), the Court of Appeals applied it to an escape from custody crime. While defendant Jones was in the Allen County jail awaiting trial for felony theft, he was taken by the sheriff under a court order to a Coffeyville hospital for treatment for a heart condition. Under that doctor's orders he was taken by ambulance to a Kansas City, Missouri, hospital. After he was released from the hospital, he fled and was later apprehended in California. The court first concluded that his failure to return constituted an "escape" because his delivery to the hospital for treatment was "temporary leave lawfully granted pursuant to . . . order of a court," as defined by the aggravated escape statute, and he failed to return to custody following it. More important to the instant case, the *Jones* court held the crime was one over which Kansas had jurisdiction:

"K.S.A. 21-3104(3) says defendant's 'omission to perform a duty imposed by the law of this state,' *i.e.*, to return to custody, resulted in a crime 'within the state.'

As the Judicial Council note reflects, the statute codifies the common law principle that a person may commit a crime within this state while remaining outside of it, and such crime may be an act of omission as well as an act of commission. See *In re Fowles,* 89 Kan. 430, 131 Pac. 598 (1913)." 9 Kan. App. 2d at 106-07.

Nine years later in *State v. Grissom,* 251 Kan. 851, 889, 840 P.2d 1142 (1992), we held that K.S.A. 21-3104 is to be interpreted broadly.

Illinois also provides persuasive support for our decision as its criminal jurisdiction statute served as the basis for subsection (3) of K.S.A. 21-3104. See K.S.A. 21-3104 (Ensley 1988), Judicial Council note, 1968. Section 1-5 of the Illinois Criminal Code of 1961 (now Ill. Comp. Stat. ch. 720, § 5/1-5 [c] [2002]) states in relevant part: "(c) An offense which is based on an omission to perform a duty imposed by the law of this State is committed within the State, regardless of the location of the offender at the time of the omission."

In *People v. Caruso,* 119 Ill. 2d 376, the Illinois Supreme Court extended the subsection's reach to the context of child abduction. The court held that Illinois authorities had jurisdiction to charge the defendant with child abduction for detaining his children in the state of Ohio in violation of an Illinois court order which had granted custody to his former wife. The father contended that Illinois lacked jurisdiction because his conduct was entirely committed in Ohio. The court determined, however, that Illinois properly asserted criminal jurisdiction over his conduct since the charge was based on an omission to perform a duty imposed by the law of Illinois. 119 Ill. 2d at 382-83, 384-87.

The *Caruso* court, like this court in *Grissom,* observed that its statute was to be interpreted broadly to establish jurisdictional basis for the prosecution of offenses in Illinois. It noted that the reach of Illinois' criminal jurisdiction under the subsection was not limited by strict territorial considerations but was based on the State's interests in the performance of the duty imposed. The court also addressed the dangers of unlimited expansion of jurisdiction:

"The phrase 'omission to *perform* a duty' in section 1-5(c) (emphasis added) indicates that the duty involved must be an affirmative duty, that is, a duty to positively act. Requiring that the duty be affirmative is necessary to avoid an absurdity.

If the definition of duty under section 1-5(c) included a passive duty, that is, a duty to *refrain* from certain conduct, then the entire Criminal Code could fit under section 1-5(c). For example, it might be said that everyone has a duty to refrain from killing or stealing. Complying with that duty to refrain from that conduct does not require an individual to 'perform' any act." 119 Ill. 2d at 383.

While both *Jones* and *Caruso* dealt with violations of court orders, such orders are not required by K.S.A. 21-3104(3). A defendant need only commit a crime based on an omission to perform a duty imposed by the law of this State. See also *State v. Wolfe*, 2000 WL 1370136 (Ohio App. 2000) (unpublished opinion) (finding jurisdiction in state of car rental agency under similar statute based upon failure to return rented automobile); *State v. McGill*, 115 Or. App. 122, 124-25, 836 P.2d 1371 (1992) (finding jurisdiction in location of rental shop under similar statute based upon failure to return rented television set). Based upon the unique facts of this case, the Johnson County District Court therefore had jurisdiction under this provision.

Issue 2: *Did the district court err in failing to suppress James' statements to the police?*

James alleges that the district court erred in failing to suppress his statements. More specifically, he claims they were elicited in a custodial interrogation in which the officer failed to advise him of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). Accordingly, he demands a new trial.

*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her "in custody." *State v. Fritschen,* 247 Kan. 592, Syl. ¶ 2, 802 P.2d 558 (1990). The threshold issue is therefore whether James was in custody when the statements were made; this determination is made on a case-by-case basis according to the facts. 247 Kan. at 597, 603. An objective standard is used to judge whether an interrogation is custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. 247 Kan. 592, Syl. ¶ 2.

The district court determined that James was not in custody at the time he gave the statements. Some ambiguity has arisen over our standard of review of this issue. *Fritschen* and some other cases suggest the custody determination is a finding of fact and, consequently, that our review is only for substantial competent evidence to support the finding. See 247 Kan. at 605 (record contains evidence to amply support trial court's finding that Fritschen was not in custody); *State v. William,* 248 Kan. 389, 406, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (trial court ruled that William was not in custody, and record contained substantial competent evidence to support that conclusion). After a suppression hearing, this court in *State v. Haddock,* 257 Kan. 964, 976, 897 P.2d 152 (1995), reviewed the trial court's ruling that defendant was not in custody as follows: "If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court. [Citation omitted.]"

This court has used language similar to *Haddock's* in other cases to describe its deferential standard of review on the issue of custody, but ambiguity has arisen when we have also analyzed issues intertwined with custody:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and knowingly given, and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. [Citation omitted.]" *State v. Clemons,* 251 Kan. 473, 480, 836 P.2d 1147 (1992).

See *State v. Valdez,* 266 Kan. 774, 790-01, 977 P.2d 242 (1999).

In our most recent case involving custody, *State v. Washington,* 275 Kan. 644, 661, 68 P.3d 134 (2003), we stated that our standard for reviewing the issue contains two steps:

"Thus, the standard to be applied is that the appellate court reviews the factual underpinnings of a district court's decision that the defendant was not in custody by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. The determination is made based upon a totality of the circumstances applying the objective standard of a reasonable person. See *Fritschen, William,* and *Toothman.*"

This statement in *Washington* was based primarily upon our standard of review in suppression of evidence cases, *e.g.*, *State v. Toothman*, 267 Kan. 412, 416, 985 P.2d 701 (1999), of which custody determinations are a subset. In *Toothman*, we stated:

"An appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of the evidence is a legal question requiring independent appellate review." 267 Kan. at 416.

We reaffirm our two-step analysis articulated in *Washington* for reviewing district court determinations of whether custody existed at the time defendant's statements were made that he later wishes to suppress. We repudiate the language in our prior cases which expressly states or infers that the custody determination is solely a factual one subject to a different analysis. We also clarify that the *Washington* language referring to totality of the circumstances refers only to the district court's review of all the facts which are relevant to how a reasonable person in the suspect's position would have understood the situation, *i.e.*, whether in custody or not, since this determination is made on a case-by-case basis. See 275 Kan. at 661.

Having clarified our standard of review, we first determine if the district court's findings in the instant case were supported by substantial competent evidence. The district court found that when the officers first became involved they faced a situation involving two unattended deaths they knew little about and were consequently required to learn what had happened. It also found that James' own testimony indicated the hospital staff, not law enforcement officers, put him in the private waiting room. The court further found that though James spent some time in the room with an officer outside the door, this was appropriate because law enforcement needed to talk with the person who had brought the decedents to the hospital to learn what had happened.

The court further found that James was allowed to remain in the room with all of his personal property including a cell phone and access to the hospital's telephone. It additionally found that he used

the telephone and the hospital chaplain apparently was there with him.

The district court additionally found that James was transported to the police station so the detective could inquire about the unattended deaths. The court also noted there were never any handcuffs or shackles of any kind and that James' property, including his telephone and pager, remained with him at all times at the station. While the court acknowledged that much of the questioning occurred at the police station and that James testified to the officer holding up his hand to stop James from leaving and being escorted by the officers with their hands on him at times, the court also observed it was entitled to consider the totality of the facts and circumstances. The court also acknowledged its entitlement to give weight to the evidence and to judge the credibility of witnesses.

The court acknowledged that James had spoken with an attorney but found that, under the circumstances, a reasonable person would have cooperated with such an investigation and proceeded despite the consultation. The court further found that since James was unaware of the Missouri warrant until after the questioning concluded, the warrant did not convert the questioning into a custodial interrogation because the custody test is based on the objective standard of what a reasonable person would have understood.

We hold substantial competent evidence exists to support these findings. James admitted that hospital staff, not law enforcement, escorted him to the hospital private waiting room and that while there he made a phone call. According to Corporal McLaughlin's testimony, James agreed to cooperate and voluntarily went to the police station. According to Detective Daniels' testimony, James was never restrained in any way and was allowed to keep possession of his personal items. James testified he used his cell phone to make several calls, including one to his attorney. Although his attorney advised him not to talk to law enforcement, he did so anyway. He further admitted he was never shackled or handcuffed, nor told he was under arrest. He also admitted he was told the process was over and then left the interview room. Daniels testified that James

was not told about the Missouri warrant until the conclusion of the interview. Though James contradicted some of the officers' testimony, on appeal we do not reweigh the evidence nor judge the credibility of the witnesses. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 387, 22 P.3d 124 (2001).

We next consider step two in our analysis, a "de novo review of the legal question relating to custody." *Washington,* 275 Kan. at 665-66. The district court concluded it was not a custodial interrogation that would require a *Miranda* warning. We agree. We conclude as a matter of law based upon the evidence before the district court that the defendant was not under arrest or in custody prior to the time a *Miranda* warning was given. See 275 Kan. at 666. More specifically, the facts cited above support the legal conclusion that a reasonable person would not have believed James was in custody.

Affirmed.