IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,650

STATE OF KANSAS,
*Appellee*,

v.

CAROL SUE BURRIS,
*Appellant.*

SYLLABUS BY THE COURT

1.

A person may be held criminally liable for a failure to act if that person owes a legal duty of care. Legal duties of care can arise out of either common law or legislative enactment.

2.

A legal duty of care is imposed at common law when a person is in a special relationship with another. One such relationship is marriage. A legal duty of care also arises when a person has voluntarily assumed the care of another and has prevented others from rendering aid.

3.

K.S.A. 2022 Supp. 21-5417 imposes a legal duty of care on the primary caregivers of dependent adults.

Review of the judgment of the Court of Appeals in 63 Kan. App. 2d 250, 528 P.3d 565 (2023). Appeal from Coffey District Court; TAYLOR J. WINE, judge. Oral argument held December 14, 2023. Opinion filed March 15, 2024. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, argued the cause, and *Caroline M. Zuschek*, of the same office, was with him on the briefs for appellant.

*Steven J. Obermeier*, deputy solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: Carol Sue Burris was charged with mistreatment of a dependent adult and the second-degree reckless murder of Michael Burris, Burris' husband of over 45 years. Michael suffered from dementia and other significant health issues and relied on Burris—as Michael's sole caregiver—to tend to his needs. Yet trial evidence showed that Burris not only did not adequately care for Michael, but also actively prevented others from assuming or providing his care. Burris did not tend to his wounds, did not give him his required medications, did not bathe him or help him use the toilet, and did not provide him with enough food and water to survive. Michael ultimately died of pneumonia with severe emaciation as a significant underlying factor, and a jury convicted Burris of both charges. Burris' convictions were affirmed by the Court of Appeals, and we granted her petition for review. She argues that her conviction for reckless but unintentional second-degree murder must be reversed, as it is based only on a *failure* of care—that is, on omissions (things she did not do) rather than affirmative acts (things she did do). Her argument is premised on the idea that she had no duty to act—to provide the care at issue—under these facts. She also claims the prosecutor committed three reversible errors during closing arguments.

Today we conclude that Burris owed a clearly defined legal duty of care to summon or provide medical care for Michael based on their marital relationship, Burris' voluntary assumption of Michael's care, and her role as Michael's sole caregiver under K.S.A. 2022 Supp. 21-5417. We also find no prosecutorial error occurred. As such, we affirm Burris' convictions.

FACTS

As the parties do not dispute the facts as recited by the panel in *State v. Burris*, 63 Kan. App. 2d 250, 251-56, 528 P.3d 565 (2023), we adopt them for use here:

"A. *Carol's neglect and Michael's deteriorating health*

"In April 2016, two paramedics were dispatched to the home of Carol and Michael Burris after receiving a report that Michael fell and needed assistance. When paramedics arrived, Carol directed them to a back room of the home where they found Michael on the floor in underwear stained yellow, smelling of urine, and with sores on his legs that suggested he lay on the floor for an extended period of time. One of the paramedics, Roy Rickel, also observed that Michael was very thin, appeared to be dehydrated, and had several cuts across his arms in various stages of healing. After Carol left the room, Michael told Rickel that he remained on the floor for about two weeks after falling and resorted to cutting himself with the hope it would induce Carol to call for help. He said Carol provided him with doughnuts and water and occasionally cleaned his urine and feces off the floor.

"Michael was transported to the hospital where doctors diagnosed an infection in his leg, an ulcer caused by a pressure sore, low potassium levels, and dehydration. Michael informed a nurse that he had not eaten recently because Carol would not cook for him, but he could not call for help because Carol took his cell phone away. He also told his sister, Terry Taylor, that Carol refused to give him his cell phone and left him on the floor for several days after he asked her to call for help. Michelle Gast, a social worker for the Department for Children and Families, investigated allegations that Carol

3

subjected Michael to neglect. Carol told Gast she felt responsible for caring for Michael, providing his meals, assisting with his toileting needs, and transporting him to medical appointments. Yet when Gast asked whether Carol gave Michael his prescribed medications, Carol said she gave him her own medications instead because she could not get him out of the house to see the doctor. Carol acknowledged Michael remained on the floor for an unknown duration after his fall but remarked that it was not possible for her to move him given the disparity in their respective sizes. When Gast inquired why Michael cut himself Carol refused to answer.

"Dr. John Shell recommended Michael be discharged to Life Care Center, a nursing home facility, so he could increase his strength, ambulate on his own, and care for himself more independently before returning home. Michael believed that Life Care presented a good option but told Lucas Markowitz, a social worker, that he wanted to speak with Carol first. Following his conversation with Carol, Michael expressed a change of heart about his care and requested to return home immediately. He did agree to receive home health services.

"Michael remained in the hospital for nine more days and was then transported home by paramedic Aaron Williams. Upon their arrival, Carol cautioned Williams to not disturb their dogs and to get Michael inside as quietly as possible. Williams tried to give Carol the necessary instructions for Michael's care, but she grew annoyed and spoke over him. The hospital's home health department called the Burrises to speak with Williams while he was at the house, but Carol refused to allow the communication. Williams left the residence fearing that Michael was at risk of neglect, so he filed a report with the Kansas Department for Children and Families.

"Paramedics returned to the home nine days later in response to a call from Carol that Michael fell again. Roy Rickel was again among the responders and found Michael in a position much like that he was in following his first fall. This time, Michael apparently fell out of his chair three or four hours before the paramedics arrived. They transported him back to the hospital, and Dr. Shell diagnosed him with high levels of potassium. Michael was discharged to Life Care Center and treated for elevated potassium levels, diabetes, and hypothyroidism. He was also diagnosed with mild-to-moderate dementia. The facility discharged Michael roughly three weeks later and sent

4

him home with prescriptions for Synthroid, Metformin, Mirtazapine, and Amlodipine to be taken daily. Carol told Life Care that home health assistance was unnecessary because she planned to care for Michael herself.

"Michael's sister, Terry, called from time to time to check on his health after he returned home, but no one answered her calls for days at a time, so she finally left a message in which she threatened to call the police for a welfare check. About 10 minutes after Terry left that message, Carol called back and permitted her to speak with Michael. Terry offered to allow the couple to move into her guest house so they could be closer to her, but Carol declined. Carol also complained to Terry that she could not even take care of herself well because of the constant care and attention Michael required from her. Terry encouraged her to explore government-funded home healthcare programs, but Carol dismissed the suggestions because neither she nor her dogs liked when healthcare professionals visited the home.

"Around this time, Gast visited the Burris' home to check on Michael's well-being, but Carol slammed the door in her face. As Gast returned to her car, Carol yelled from the porch that they were tired of people coming to their house and wanted to be left alone. Gast again requested to see Michael, but Carol claimed he did not have any clothing on. When Gast suggested that she simply cover him with a blanket, Carol asserted that if Gast came inside she did not have a place to put her dogs. Gast persisted but Carol remained steadfast in her refusal and then claimed that a visit was not possible because Michael was asleep, and she needed to leave to get his medication. Gast finally left without seeing Michael. She advised Adult Protective Services (APS) that she substantiated the allegations of Carol's abuse of Michael, and that Carol 'failed to obtain medical services for [Michael] after he fell on the floor despite his request for assistance and [that he cut] himself to get medical attention.' APS sent notices of the report to Carol and Michael.

"B. *Michael's third trip to the hospital and death*

"Paramedics were ultimately dispatched to the Burris' home for a third and final time. When they entered Michael's room at the back of the house, they were over-whelmed by the stench of stale urine and feces. When one of the paramedics, Jared Saiz,

5

reached for a light switch, Carol shoved his hand away and told him not to turn the light on. Michael was lying on the couch wrapped in layers of blankets, with his eyes closed, and mouth open gasping for air. Saiz peeled back the blankets and observed that Michael was severely thin with his flesh sucked up under his rib cage. He assessed Michael for a possible intubation and noticed Michael's mouth was completely dry. Carol claimed that Michael ate four meals—which consisted of her pouring juice into his mouth—and spoke with her just the day before. When Saiz loaded Michael onto the stretcher to take him to the hospital, he noticed Michael's blankets were caked in feces.

"Dr. Christopher Jarvis treated Michael at Coffey County Hospital and immediately observed Michael was extremely emaciated and covered in human waste. Jarvis, who had practiced medicine in the area for 20 years, had never witnessed a person as emaciated as Michael. Once Michael was stabilized, Jarvis ordered his transfer to Stormont Vail Hospital in Topeka as it was equipped to provide a higher level of care. A charge nurse who examined Michael upon his arrival at Stormont Vail noted a litany of health problems including several pressure injuries, open peeling areas on his back, dirt covering his body, matted hair on his head, foul-smelling exposed necrotic tissue, round open wounds on his buttocks and legs, bruises on his right forearm, and severe emaciation. Terry traveled to Topeka to visit Michael and then called Carol who remarked that she thought Michael had already passed. Carol never visited Michael before he died.

"Michael died only a few hours after his arrival in Topeka. He was returned to the Coffey County Hospital, where Dr. Jarvis declared pneumonia to be the official cause of death and that it was the product of his critically emaciated state. Michael's driver's license reflected he weighed 250 pounds in 2012; at his autopsy, he weighed only 124 pounds. Jarvis classified Michael's death as a homicide because given his severe emaciation 'it seemed appropriate that whoever was caring for him would have sought care long before he reached that point so [*sic*] neglect.' Dr. Erik Mitchell, a forensic pathologist, later found a breakdown of Michael's skin surface consistent with long periods of immobility and determined that he failed to sustain an adequate caloric intake over a significant period of time as required to maintain his physical structure.

"C. *Criminal investigation, pretrial proceedings, and trial of Carol Burris*

"The Coffey County Sheriff's Department executed a search warrant on the Burris' home and Undersheriff Thomas Johnson interviewed Carol. During their discussion, Carol was consistently distracted by her dogs' need to be kenneled and commented that she refused home healthcare services because her dogs did not like them. Carol also told Johnson that she did not give Michael his prescribed medications because she could not get to the doctor to have them filled. Officers recovered Michael's discharge summaries and care instructions from Carol's bedroom.

"In September 2018, the State charged Carol with one count each of mistreatment of a dependent adult and reckless second-degree murder. . . .

"The case proceeded to trial, and the State presented testimony from paramedics, hospital staff, medical examiners, Michelle Gast, Terry Taylor, and law enforcement personnel. It also admitted the photographs from Michael's autopsy and various items obtained from the search of the Burris' home into evidence.

. . . .

"The jury returned guilty verdicts for both charged offenses, and the district court sentenced Carol to a prison term of 125 months." 63 Kan. App. 2d at 251-56.

The panel affirmed Burris' convictions, concluding that Burris' failure to provide life-sustaining care for Michael after unequivocally assuming the responsibility to do so properly subjected her to prosecution for both charged offenses. 63 Kan. App. 2d at 263-64. The panel further found that the prosecutor's closing argument did not contain reversible error. 63 Kan. App. 2d at 273. We granted Burris' petition for review. Jurisdiction is proper. K.S.A. 60-2101(b) (this court has jurisdiction to review Court of Appeals decisions upon petition for review).

7

Burris acknowledges she did not argue below that she had no legal duty to care for Michael. But she claimed the panel could still review the issue because it presented only a legal question arising on proved or admitted facts. See *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021).

The panel agreed to review the first part of her claim—that she had no legal duty to care for Michael and thus could not be convicted of a crime based on a failure to act—on the grounds that an appellate court may consider issues raised for the first time on appeal when the newly asserted claim is a purely legal one. *Burris*, 63 Kan. App. 2d at 256-57 (citing *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 [2021]). The panel did, however, decline to reach the merits of Burris' related due process claim (that if there was a legal duty to act, she did not have sufficient notice of that duty). 63 Kan. App. 2d at 264-65. The parties continue to dispute whether we ought to consider the merits of the due process argument.

We need not split the preservation hairs too finely in this case, however, as the lawfulness of a conviction premised on proven acts of omission rises or falls upon the resolution of the question of duty. And a duty imposed without sufficient notice is no duty at all. See, e.g., *Rogers v. Tennessee*, 532 U.S. 451, 461-62, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001) (courts cannot impose a retroactive application that is unexpected and indefensible by reference to the expressed law prior to the conduct at issue); *Com. v. Morris*, 142 S.W.3d 654, 662-63 (Ky. 2004) (adopted new definition which criminalized defendant's conduct, but reversed defendant's conviction because he had no notice of articulated duty at the time he committed the crime). Given this, we consider the notice question fairly subsumed within the question of duty and will therefore consider the argument on its merits.

These preservation questions settled, we will exercise unlimited review in determining whether Burris' acts of omission in failing to care for Michael place her within the scope of our second-degree murder statute. See *State v. Busch*, 317 Kan. 308, 310-11, 528 P.3d 560 (2023). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. In ascertaining this intent, we begin with the plain language of the statute, giving common words their ordinary meaning. When a statute is plain and unambiguous, we will not speculate about the legislative intent behind that clear language. 317 Kan. at 310-11.

Burris was convicted for "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2016 Supp. 21-5403(a)(2). Burris argues this statute requires a voluntary act, and that she cannot be found guilty by omission in the absence of a statutorily-defined duty to act. She anchors her argument in K.S.A. 2022 Supp. 21-5201 and *State v. Dinkel*, 311 Kan. 553, 558-61, 465 P.3d 166 (2020).

In *Dinkel*, the defendant was convicted of statutory rape. Dinkel claimed, however, that in fact she had been the victim of forcible rape at the hands of the child. We contemplated, then, whether, if Dinkle's allegations were true, she had committed the necessary actus reus of the crime of statutory rape. 311 Kan. at 558-59. Dinkel, like Burris, relied on K.S.A. 2012 Supp. 21-5201, which requires a voluntary act before criminal liability may be imposed.

K.S.A. 2022 Supp. 21-5201 provides:

> "(a) A person commits a crime only if such person voluntarily engages in conduct, including an act, an omission or possession.

"(b) A person who omits to perform an act does not commit a crime unless a law provides that the omission is an offense or otherwise provides that such person has a duty to perform the act."

*Dinkel* evaluated what it means for conduct to be "voluntary," explaining:

"Black's Law Dictionary defines 'voluntary' as '[d]one by design or intention.' Black's Law Dictionary 1886 (11th ed. 2019). It defines 'conduct' as '[*p*]*ersonal behavior*, whether by action or *inaction*, verbal or nonverbal; the manner in which a person behaves; collectively, a person's deeds.' Black's Law Dictionary 369 (11th ed. 2019). According to these definitions, 'voluntary conduct' is 'personal behavior' 'done by design or intention.'

"Black's Law Dictionary also provides a definition of a 'voluntary act,' which is a term included in the title of the statute. A 'voluntary act' is:

"'A willed bodily movement; esp., the type of act that is necessary for the imposition of criminal liability when such liability is not predicated on an omission. Under both the common law and the Model Penal Code, a person cannot be held liable for a crime without engaging in a prohibited *voluntary* act *or omission*. A bodily movement that is a product of the effort or determination of the actor, either conscious or habitual, is a voluntary act. Reflexes, convulsions, and movements made while unconscious, asleep, or under the influence of hypnosis are not voluntary acts.' Black's Law Dictionary 32 (11th ed. 2019)." (Emphases added.) 311 Kan. at 559.

Burris suggests *Dinkel* supports her claim that her "murder conviction can only be supported by an *act*." But crucially, Burris confuses the distinct concepts of omission and voluntariness and blurs them together, suggesting that an omission can never be a voluntary act. This is simply wrong, both as a matter of logic and statutory interpretation. A decision *not* to do something may be just as much a voluntary act as a decision *to* do something. A fact the statute makes clear. "A person commits a crime only if such person

10

*voluntarily engages in conduct, including . . . an omission*." K.S.A. 2022 Supp. 21-5201(a) (emphasis added); see also K.S.A. 2022 Supp. 21-5111(a) (providing an "'Act' includes a failure or omission to take action").

In other words, while Burris grounds her argument in *Dinkel*'s holding that a voluntary act is required as part of the actus reus of a crime, this holding does not actually help her. *Dinkel* never suggested that an omission was not or could not be a voluntary act. The crucial question in this case is not voluntariness—Burris never presented any argument or evidence below that her omissions were involuntary—but rather the existence or absence of a duty to act.

We have a specific, clear, and unambiguous statutory framework for deciding cases such as this. K.S.A. 2022 Supp. 21-5201(b) instructs that a "person who omits to perform an act does not commit a crime unless a law provides that the omission is an offense or otherwise provides that such person has a duty to perform the act." The panel concluded that a "formal duty of care is unnecessary to sustain a conviction under K.S.A. 2022 Supp. 21-5403(a)(2)" and that "a failure to act is included within its reach." *Burris*, 63 Kan. App. 2d at 263. We disagree and disapprove this language. Because K.S.A. 2022 Supp. 21-5403(a)(2) does not explicitly criminalize omissions, the existence of a formal duty to act is indeed required in order to sustain a conviction based on voluntary failures to act. But in these circumstances, we do not find it difficult to locate multiple sources of law imposing a legal duty on Burris to have provided or summoned medical care for Michael. Thus, we affirm the panel as right for the wrong reason. See *State v. McCroy*, 313 Kan. 531, 539, 486 P.3d 618 (2021) (affirming Court of Appeals as right for the wrong reason).

Generally, citizens are under no obligation to aid one another, though some common-law exceptions have long been recognized. One clear exception exists when a person is in a special relationship with another—such as a marital relationship. Another

11

exception involves circumstances when a person has voluntarily assumed the care of another and prevented others from rendering aid. See, e.g., *Jones v. United States*, 308 F.2d 307, 310 (D.C. Cir. 1962); Stewart, *How Making the Failure to Assist Illegal Fails to Assist: An Observation of Expanding Criminal Omission Liability*, 25 Am. J. Crim. L. 385, 394-95 (1998). And in Kansas, the common law continues to apply unless explicitly modified. See K.S.A. 77-109 (common law as modified by constitution, statute, and judicial decisions shall remain in force in aid of the general statutes of the state); *Gonzales, Administrator v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 689, 695, 371 P.2d 193 (1962) ("From the beginning of our history as a state [Territorial Laws 1855, ch. 96, Laws 1862, ch. 135, G.S. 1935, 77-109] the common law of England has been the basis of the law of this state, and except as modified by constitutional or statutory provisions, by judicial decisions, or by the wants and needs of the people, it has continued to remain the law of this state."); *City of Haven v. Gregg*, 244 Kan. 117, 122, 766 P.2d 143 (1988) ("In Kansas, the common law remains in force, unless modified by constitutional amendment, statutory law, or judicial decision.").

Burris tries to claim she had no duty to care for her spouse because there was "no evidence in this case that [Burris] accepted legal responsibility for Michael's care." But our common law makes clear that she accepted legal responsibility for Michael's care the moment they were married. "Unquestionably there is a common-law marital duty to provide medical attention to one's spouse." *People v. Robbins*, 83 A.D. 2d 271, 272, 443 N.Y.S.2d 1016 (1981); see also *Reardon v. King*, 310 Kan. 897, 903, 452 P.3d 849 (2019) (Kansas common law recognizes a special relationship between employers and third parties who come into contact with their employees); *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991) ("A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities, and persons with custody of another."); *Westrup v. Commonwealth*, 123 Ky. 95, 93 S.W. 646, 646 (1906) ("Where the husband neglects to provide necessaries for his wife, or medical attention in case of her illness, he will be

guilty of involuntary manslaughter, provided it appear that she was in a helpless state and unable to appeal elsewhere for aid, and that the death, though not intended nor anticipated by him, was the natural and reasonable consequence of his negligence."); *State v. Smith*, 65 Me. 257, 258 (1876) (husband criminally liable for wife's death for neglecting to provide protection from winter weather); *Territory v. Manton*, 8 Mont. 95, 19 P. 387, 392 (1888) (same); *State v. Mally*, 139 Mont. 599, 609-10, 366 P.2d 868 (1961) (husband had a duty to summon medical aid for his injured and ill wife—who was "as helpless as [a] newborn" and "could not have consciously or rationally denied medical aid"—and breach of that duty resulted in criminal liability); Collins, Leib & Markel, *Punishing Family Status*, 88 B.U. L. Rev. 1327, 1335-36 (2008) (spousal relationship is a "paradigmatic example[] of status relationships in which one owes a duty to rescue sufficient to trigger criminal responsibility").

Burris then claims that "simply attempting to provide Michael care did not create a legal duty for [Burris] to care for him. There is simply no such duty in the law." Again, her claim is incorrect. Our common law has long been that "once a person steps into the role of caregiver, such that others are discouraged or precluded from filling that role, that person has a duty to act reasonably in fulfilling the adopted role." *State v. Wilson*, 267 Kan. 550, 562, 987 P.2d 1060 (1999) (citing LaFave and Scott, 1 Substantive Criminal Law § 3.3[a][1], [4], and [5] pp. 282-88 [1986]); see also Stewart, 25 Am. J. Crim. L. at 396 ("The reason for this exception is that one who voluntarily assists another might worsen the victim's position by subjecting him to other dangers or by preventing someone else from undertaking the rescue."); *State v. Gargus*, 462 S.W.3d 417, 418-24 (Mo. Ct. App. 2013) (daughter moved in to care for elderly mother; mother eventually became septic and died due to gangrene and extreme neglect; daughter's conviction for involuntary manslaughter affirmed because she undoubtedly had a duty to act after voluntarily assuming care of her mother, which "created criminal liability for the negligent performance of that duty"); *Davis v. Commonwealth*, 230 Va. 201, 205, 335 S.E.2d 375 (1985) (affirming daughter's conviction for involuntary manslaughter in the

13

death by starvation of her elderly mother; the court found a common-law duty existed based on the evidence in the case that the daughter had "accepted sole responsibility for the total care" of her mother); *Com. v. Pestinikas*, 421 Pa. Super. 371, 398-99, 617 A.2d 1339 (1992) (Tamilia, J., concurring) (citing *Regina v. Hughes*, 7 Cox C.C. 301, 302 [1857]) ("What makes the . . . assumption of care a duty imposed by law is assumption of a responsibility for the care of a dependent person who thereby loses the protection he would have for being cared for by others with more specific legal responsibility. The history of homicide by omission to provide care, primarily is traced through English law, and American cases that clearly followed English law."); *State v. Shrout*, 415 S.W.3d 123, 125 (Mo. Ct. App. 2013) ("[A] duty of care arises, sufficient to support an involuntary manslaughter conviction, when one 'voluntarily assumes the care of a mentally handicapped individual, being fully aware of the individual's physical and mental condition and the care challenges created by those conditions.'"); cf. *Sickel v. State*, 363 P.3d 115, 117 (Alaska Ct. App. 2015) ("It is true that the cruelty to animals statute fails to specify which persons have a duty to care for particular animals. But we are authorized to look to the common law to remedy this omission. . . . [T]he statute applies to all persons who have undertaken responsibility for the care of an animal.").

Finally, in addition to common-law duties of care, Burris was also compelled by a statutory duty of care. As the sole caregiver for Michael, K.S.A. 2016 Supp. 21-5417 imposed a statutory duty of care on Burris. See *State v. James*, 276 Kan. 737, 746, 79 P.3d 169 (2003) ("[A]dults in Kansas who are unable to protect their own interest are dependent upon their caretakers. It logically follows that their *caretakers possess an affirmative duty* to provide this protection." [Emphasis added.]). As Michael's self-proclaimed and exclusive caregiver, Burris had a legal duty to protect his interests under K.S.A. 2016 Supp. 21-5417.

Burris has conceded that her omissions—failing to provide resources, failure to feed, and failure to otherwise properly care for Michael—could lawfully result in criminal responsibility for Michael's death "if she had a *legal* duty to provide care and resources to him." We conclude Burris undoubtedly had such a legal duty—springing from multiple sources of law—to provide care and resources to her husband.

Finally, Burris challenges these legal duties to care for Michael on the grounds of notice (whether a failure of sufficient notice renders the imposition of the duty a violation of constitutional due process or simply a nullity is irrelevant for our purposes today). The fundamental principle underlying a sufficient notice requirement is that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939). Yet ignorance of the law or mistake of law is never a valid defense. *State v. Watson*, 273 Kan. 426, 434-35, 44 P.3d 357 (2002) (citing *Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 [1991] ["The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."]). And though it is perhaps unlikely that individuals will "carefully consider the text of the law," still it remains important "that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931). When examining whether the criminal law has provided fair notice, the touchstone is whether the decision is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers*, 532 U.S. at 461-62.

In this case, application of longstanding traditional common-law duty rules is not at all "unexpected and indefensible." Not only has Kansas explicitly affirmed a continued adherence to the common law as "the basis of the law[s] of this state" that remains in

15

effect unless specifically modified, *Gonzales*, 189 Kan. at 695, virtually every state makes it clear that there is "[u]nquestionably . . . a common-law marital duty to provide medical attention to one's spouse." *Robbins*, 83 A.D. 2d at 272. Furthermore, the legal duty arising from the voluntary assumption of care is widely utilized and understood. And of course, the application of a Kansas statute is also not "unexpected and indefensible." See *Rogers*, 532 U.S. at 461-62.

In short, a husband and wife of 45 years lived alone together outside of town. The wife knew her husband needed intensive, round-the-clock care; yet she secluded him, did not give him required medication, did not adequately feed him, did not treat his wounds, left him in squalor and inhumane conditions from which he was incapable of escaping, refused access to home health services, prevented others from caring for him, and repeatedly turned down all offers of help from family and social workers. In a civilized society with deeply entrenched notions of the duties citizens may and do owe to their fellow human beings, we do not find it difficult to conclude that Carol Burris had "fair warning" that these voluntary acts—whether of omission or commission—subjected her to criminal liability for violating her plain legal obligations of care toward her husband. See *McBoyle*, 283 U.S. at 27.

We now turn to Burris' claims of prosecutorial error. Burris did not object to any of the prosecutor's comments that she challenges on appeal. But a defendant need not contemporaneously object to a prosecutor's comments to preserve claims of error for appellate review. *State v. Slusser*, 317 Kan. 174, 184, 527 P.3d 565 (2023). However, "the presence or absence of an objection may figure into the analysis of the alleged error." *State v. Sean*, 306 Kan. 963, Syl. ¶ 5, 399 P.3d 168 (2017).

We employ a two-step analysis when reviewing prosecutorial error claims. First, we determine whether error occurred. Under the first step, we analyze whether the prosecutor's acts fell outside the wide latitude afforded prosecutors. In doing so we

16

consider the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020). A defendant meets the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences outside of what the evidence showed. *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019). If we find the prosecutor erred, we then determine whether prejudice resulted. At this second step we focus on whether the error prejudiced the defendant's due process rights to a fair trial. *Slusser*, 317 Kan. at 184-85. Burris raises three claims of prosecutorial error. We conclude that each claim fails at the first step, so we need not conduct a prejudice analysis.

Burris first claims that the prosecutor improperly commented on her decision not to testify. But she does not fairly characterize the prosecutor's statement—the prosecutor was discussing Burris' two-and-a-half-hour-long interview with law enforcement that was played for the jury, and referring to her lack of explanation to law enforcement during that interview. Burris attempts to divorce the comment from its context, but "[c]ourts do not isolate the challenged comments; they consider them in the context they were made." *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018).

The prosecutor's full statement in context about that interview is illustrative:

"You heard no evidence from her. *She had two and a half hours*. You heard that she said—well, there was questions from the defense insinuating that he said that he had a loss of appetite, refused food, right? You heard no evidence of that. None. Not one person testified to that, that that happened. And more importantly if that had happened, *in two and a half hours she talked about everything. In two and a half hours, don't you think that would have been the first thing*, look, he wanted to die. Look, he didn't want to eat. Look, he had a loss of appetite. She doesn't say that. She says he didn't have a problem other than his teeth but I just chopped it up into small bits.

17

"Mr. Markowitz provides training and education to her about what is available.

"Aaron Williams attempts to provide her education. She won't listen. She talks over him just like she continued to talk over Mr. Johnson *many, many times during that interview*. She ignores all of them.

. . . .

". . . What does *she say multiple times at the end of that interview?* I need my money to hire people to do things." (Emphases added.)

Upon considering the statement in the context in which it was made, it is clear that the prosecutor was not commenting on Burris' invocation of her right not to testify. The panel highlighted this, and Burris does not offer any argument why the panel erred. She simply reiterates that it was an improper comment. We conclude there was no error in this statement.

Burris' next claim of error results from the prosecutor's commentary on her marriage and wedding vows, which she asserts were improper as they only served to inflame the jury.

The prosecutor began his closing argument in the following manner:

"I take thee to be my wedded husband, to have and to hold from this day forward, for better for worse, for richer for poorer, in sickness and in health, to love and to cherish till death do us part.

. . . .

"But here's the thing, whether you're married 45 years, 30 years, or ten minutes, a marriage is defined by certain things. Lot of people think it's defined by that wedding

18

day, right, when the dress is so pretty, when the suit is all pressed, when the flowers smell so good, and the cake tastes so sweet, right. The reality is the marriage isn't defined by that day.

"The marriage is defined by when one is at their lowest, the darkest moments, when they are in despair, when they are vulnerable, and when they are in their most need. That's when a marriage is defined because then the question is those hands that held each other on that wedding day, are they still holding each other. That's a question you should ask as you deliberate when considering whether [Mrs.] Burris had extreme indifference to the human life of Mr. Burris."

The Court of Appeals, 63 Kan. App. 2d at 269, determined that the reference to the Burris' wedding vows was error, because "[c]omments from a prosecutor in closing arguments that inflame the passions or prejudices of a jury are prohibited." *State v. Nesbitt*, 308 Kan. 45, Syl. ¶ 6, 417 P.3d 1058 (2018). The panel concluded that the comments in this case fit squarely among the types of comments this court has previously found to be error, but that the error was harmless as there was no reasonable probability it contributed to the verdict. *Burris*, 63 Kan. App. 2d at 271.

The State conditionally cross-petitioned for review on the panel's conclusion that this statement was error, preserving it for our review. See Supreme Court Rule 8.03(b)(6)(C)(i) (2023 Kan. S. Ct. R. at 56) (this court only considers issues raised in a petition, cross-petition, or conditional cross-petition). The State asserts the panel erred in finding the prosecutor's comments erroneous because both parties frequently mentioned the Burris' marriage, and the prosecutor explicitly told the jurors they must not decide the case on sympathy.

In light of our discussion of the common-law duty doctrines above—significantly, the longstanding traditional duty of care owed between spouses—we conclude the prosecutor did not commit error. We find the reference to the Burris' marriage vows

19

served a legal purpose and did not commit impermissibly stoke the passions of the jury. Rather, the statement went to an element of the crime—i.e., whether Burris had a duty to act. See K.S.A. 2022 Supp. 21-5201(b). The prosecutor did not err in discussing Burris and Michael's marriage vows.

The final comment Burris challenges came at the end of the prosecutor's closing argument where he asserted that Burris undoubtedly acted recklessly with extreme indifference to human life, claiming: "There is just no other way to see it. The evidence is overwhelming just like the smell was when those EMTs went into that room."

Burris argues that this comment was an "unchecked and inflammatory opinion" and that "only the jury can decide whether evidence is 'overwhelming.'" But as the panel explained, we have previously held it "permissible for a prosecutor to argue that the evidence demonstrates a defendant's guilt," as long as the prosecutor says "something akin to 'the evidence shows defendant's guilt'" and not phrased in a way that expresses the prosecutor's personal opinion. *State v. Peppers*, 294 Kan. 377, 399-400, 276 P.3d 148 (2012); *Burris*, 63 Kan. App. 2d at 272-73. This is very nearly what happened here.

Moreover, colorful language is not erroneous in and of itself. Dramatic and theatrical language is permissible in crafting a closing argument. "'The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle.'" *State v. Chandler*, 307 Kan. 657, 688, 414 P.3d 713 (2018); see also *State v. Hilt*, 299 Kan. 176, Syl. ¶ 9, 322 P.3d 367 (2014) (prosecutor "may use analogies, similes, allusions, and other rhetorical devices"). Prosecutors "may indulge in impassioned bursts of oratory and may use picturesque speech as long as he or she does not refer to facts not disclosed by the evidence." *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000).

20

The rhetoric by the prosecutor indeed used vivid speech, but it did not go beyond the facts disclosed by the evidence. The EMT testified that the first thing he noticed when the door to Michael's room was opened was the "strong smell of feces and stale urine. . . . as soon as that door opened it hit you. It was like walking straight into a wall of it." The prosecutor did not err.

CONCLUSION

We conclude that Burris owed a clearly defined legal duty of care to summon or provide medical care for Michael based on their marital relationship, Burris' voluntary assumption of Michael's care, and her role as Michael's sole caregiver under K.S.A. 2016 Supp. 21-5417. We also find no prosecutorial error occurred. As such, we affirm Burris' convictions.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.